990 So.2d 931 (2003)
James William McGOWAN
v.
STATE.
CR-95-1775.
Court of Criminal Appeals of Alabama.
Opinion Affirming on Return to Remand July 8, 2005.
December 12, 2003.
Rehearing Denied November 23, 2005.
Certiorari Denied February 22, 2008 Alabama Supreme Court 1050293.
*942 John Gordon Brock, Evergreen; and Bryan A. Stevenson and Randall Scott Susskind, Montgomery, for appellant.
William H. Pryor, Jr., atty. gen., and Tracy Daniel and Beth Jackson Hughes, asst. attys. gen., for appellee.
William H. Pryor, Jr., and Troy King, attys. gen., and Tracy Daniel and Beth Jackson Hughes, asst. attys. gen., for appellee (On Return to Remand).
PATTERSON, Retired Appellate Judge.[1]
The appellant, James William McGowan, was convicted of two counts of capital murder: one count of murder made capital because two or more persons, Hiram E. Johnson and Mamie Lucille Johnson, were murdered by one act or pursuant to one scheme or course of conduct, § 13A-5-40(a)(10), Ala.Code 1975, and one count of the murder made capital because it was committed during a robbery in the first degree of Hiram E. Johnson, § 13A-5-40(a)(2). Subsequently, the trial court conducted a sentencing hearing pursuant to § 13A-5-46, and the jury, by a vote of 5-7, recommended that McGowan be sentenced to life imprisonment without the possibility of parole. The trial court overrode the jury's recommendation and sentenced McGowan to death.
Many of the issues raised on appeal were not presented to the trial court and are, thus, reviewed for plain error only.
"Because the appellant was sentenced to death, his failure to object at trial does not bar this Court's review of these is sues; however, it does weigh against any claim of prejudice he now raises on appeal. See Whitehead v. State, 777 So.2d 781 (Ala.Crim.App.1999); Dill v. *943 State, 600 So.2d 343 (Ala.Crim.App. 1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886 (1991).
"Rule 45A, Ala. R.App. P., provides:
"`In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.'
"This court has recognized that `"the plain error exception to the contemporaneous objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'"' Whitehead v. State, supra, at 794, quoting Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115 (1995)."
Centobie v. State, 861 So.2d 1111, 1118 (Ala.Crim.App.2001).
To address the issues presented, we have considered the following evidence.

Testimony of Accomplice Dedree Crane
According to Dedree Crane, McGowan picked her up at her parents' house near Castleberry about noon on July 18, 1999. After leaving in a blue Toyota automobile, they smoked almost all of the supply of crack cocaine McGowan had in his possession about $150 worth. After McGowan purchased an additional $50 of crack cocaine and they had smoked that, McGowan pawned Crane's ring for $20 and they bought more crack cocaine.
After they had smoked some of the last cocaine they had purchased, they went to Barry Harper's house between 3:30 p.m. and 4:00 p.m. There, Crane and McGowan smoked the rest of the crack cocaine, and Crane had oral sex with Harper in exchange for money so she and McGowan could buy more crack cocaine. They left, bought more crack cocaine, and smoked it. Then they went back to Harper's, McGowan concocted a story, and Harper gave them $125.
After buying more crack cocaine and smoking most of that, they tried to get more money from James Robert Pitts. However, he would not give them any, so they decided to return to Harper's house. On the way, McGowan told Crane that "he felt like just knocking somebody in the head, you know, to try to get some money somewhere" to purchase more crack cocaine. When they arrived at Harper's house, "some guys in a van" were there talking to Harper. When the men left, Harper and McGowan went into Harper's house. Crane followed at McGowan's direction. Inside, she told Harper that she needed to talk to him. After he approached her, McGowan hit him in the head from behind with a hammer. Harper resisted McGowan's attack until McGowan restrained him on the floor. After McGowan hit Harper in the head about four more times with the hammer, Crane went into the kitchen. After a time, McGowan came into the kitchen and handed Crane a wallet, which she put into her pocket. After reaching into a kitchen drawer, McGowan returned to the living room. Several minutes after she left Harper's house, McGowan followed. He was carrying a towel, the hammer, the shirt he had been wearing, and a large plastic bag. Blood was on his shirt, the legs of his pants, and his shoes. Harper died as a *944 result of the injuries sustained.[2]
As they were driving away, McGowan handed Crane the hammer, and she threw it out of the car window. He had her take the money$165from Harper's wallet. They then went to a Shell gasoline service station where McGowan cut the legs off of the pants he was wearing and threw away his bloody shirt, the legs of his bloody pants, Harper's wallet, the towel from Harper's house, and the cloth Crane had used to hold the hammer as she threw it from the car window.
After leaving the Shell station, McGowan and Crane bought more crack cocaine and smoked it. While riding toward Evergreen, McGowan told Crane that "he knew a place where we could go and get some more money" and "that . . . it would be a couple that . . . he would have to kill." Then they went to Frank Porter's house; Porter gave McGowan a hammer, ostensibly to repair McGowan's vehicle; and a blue and green plaid shirt.
They then went to the Johnsons' house. When Mr. Johnson came to the door, McGowan told him that he wanted to talk to him about a gun McGowan had pawned to Mr. Johnson. Mr. Johnson then invited them in. They went into the living room, but McGowan explained that he had left his car lights on, so he went back outside. He returned shortly and, when Mr. Johnson turned around, McGowan hit him on top of his head with a hammer. Crane said that after McGowan had hit Mr. Johnson three times and she saw Mrs. Johnson trying to get up from her bed, Crane ran out of the house. She went back inside when McGowan called her name. Mr. Johnson was on the floor; he was still. From the bedroom, McGowan instructed her to help him find Mrs. Johnson's purse. She went into the bedroom, but did not find the purse.
Crane then went outside and waited for McGowan in the car. After about five minutes, she could see McGowan's silhouette through the bedroom window, raising the hammer and bringing it down. After several more minutes, he came out and got into the car. He handed her a billfold and instructed her to go through its contents. She found Mr. Johnson's driver's license and a little more than $500 in cash. She gave the money to McGowan. Later, she threw the hammer, the wallet, and the contents of the wallet out of the car.
Then McGowan and Crane went to Evergreen to purchase more cocaine from "Rerun," who got into McGowan's vehicle with them. McGowan gave him $150 for crack cocaine, but before Rerun could give them the cocaine, a police officer stopped them. After approximately 15 minutes, the officer let Rerun go. The officer then followed McGowan and Crane to Abby Atterby's house in Evergreen. McGowan left Crane at Atterby's house and returned 30 minutes later. Crane left with McGowan, and they located Rerun. McGowan told him that he needed his money back because he and Crane had to "get out of the state right then." Rerun `gave McGowan $100.
McGowan and Crane then drove until they reached Slidell, Louisiana, about daybreak. Crane persuaded McGowan to stop at a motel. She went in and had someone at the front desk telephone emergency 911. When the police arrived, she told them that McGowan had been holding her against her will. The police arranged for her to telephone her mother and they let McGowan go.
*945 After giving several false statements, she led law enforcement officers to the hammer used to kill the Johnsons. At the time she testified against McGowan she had pleaded guilty to two counts of murder for killing the Johnsons as lesser-included offenses of capital murder (for which she had been indicted) in exchange for consecutive life sentences, but she had not yet been sentenced.

Testimony Presented by the Remaining State Witnesses
The Johnsons' daughter, Mary Boggan, testified that her mother was 79 years old at the time of her death and that her father was 82 years old at the time of his death. She also testified that her father's wallet and his gold watch were missing when his body was found.
James Robert Pitts testified that on a late afternoon in July, McGowan came to his residence and asked for a $10 loan; that, when he refused to loan him the money, McGowan asked if he would give him the money in exchange for sex with his female companion; and that when he refused that, McGowan and his companion left.
Chris Johnson testified that, while he was at Harper's residence on July 18, about 6:00 p.m., McGowan and a heavy set female arrived; that McGowan was wearing blue-jean shorts, but was not wearing a shirt, and he looked "rough"; and that, within an hour after he left, he saw McGowan's vehicle heading north toward Evergreen.
Dora Porter, Frank Porter's wife, testified that McGowan came to their house between 9:00 p.m. and 10:00 p.m. on July 18, 1994, and asked for a hammer, explaining that his muffler had wrapped around the drive shaft of his car, which was down the road; that he was wearing cut off blue-jean shorts and was not wearing shoes or a shirt; and that State's exhibit 26 was the hammer her husband had given McGowan.
Frank Porter testified that he introduced McGowan to the Johnsons and that he went with McGowan to the Johnsons on seven or eight occasions for McGowan to pawn items; that, when he went to see Mr. Johnson, he would always go to the back door; that, three or four months before the murders, after he and McGowan had been to the Johnsons' house, McGowan told him that they should rob the Johnsons because Mr. Johnson had "too much money on him"; that he told McGowan that he did not want to think about doing something like that because the Johnsons were "too good of friends . . . just like family"; and that Mr. Johnson always kept his wallet in his overalls. He also testified to the same facts his wife had testified to in regard to McGowan's July 18 visit except that he further testified that when he went outside to get the hammer for McGowan, he saw a vehicle with someone sitting in the driver's seat. He also identified exhibit 26 as the hammer he had given McGowan.
Kenneth Claiborne testified that his nickname is "Rerun"; that McGowan and Crane stopped him in Evergreen and McGowan gave him $150 to get them some crack cocaine; that, while the three were riding around trying to procure some crack cocaine, Sgt. James Simpson stopped them, told McGowan that his wife wanted the car; and that, about 20 minutes later, he saw McGowan and Crane again and McGowan asked him to give him back $100.
Sgt. Simpson testified that he stopped McGowan's vehicle because the police were looking for the vehicle because McGowan's wife had filed a complaint charging "unauthorized use of the vehicle" and that he detained them until Officer Wayne Stewart arrived.
*946 Officer Wayne Stewart testified that, at 12:55 a.m., he assisted Sgt. Simpson with the vehicle stop; that, when he asked McGowan if he had been home with the vehicle yet, McGowan said that he had not; that he followed McGowan in his patrol car to a residence that McGowan claimed to be his; that, after McGowan let his female passenger out of the vehicle, he followed McGowan to the gas station where McGowan's wife worked; that, there, he overheard McGowan tell his wife that he had been with his cousin all day; and that McGowan's wife (Lois Harper) seemed satisfied, so the officer left.
Carolyn Fraser, Lois's sister, testified that her sister and McGowan had lived together for approximately one year; that, while she was babysitting Lois's children at Lois's house in the early morning hours of July 18, McGowan dropped off Crane, about 1:00 a.m.; and that he returned about 30 minutes later and, a short time later, he and Crane left in Lois's car.
Lois Harper testified that she and McGowan had lived together for a year; that she owned a blue Toyota Corona automobile; that, when she woke up about 3:00 p.m. on July 18, her car was gone; that, when she next saw McGowan at 1:00 a.m. to 2:00 a.m. that next day at the service station, he was in her vehicle; that, while he was there, one of her roommates called her and told her to tell McGowan to bring the car home because he had left a woman named "Dedree" there, she testified that, when she asked McGowan who "Dedree" was, he told her that she was his half sister, but Lois knew he did not have a half sister; and that, after he left, she did not see him again until he was imprisoned.
The forensic medical examiner, Dr. James C.U. Downs, testified that the Johnsons were killed on the night of July 18 or in the early morning hours of July 19. The autopsy of Mr. Johnson's body revealed multiple lacerations to his head and fractures of the skull. The autopsy of the body of Mrs. Johnson revealed multiple head injuries and skull fractures. The medical examiner concluded that both victims died of blunt-force trauma to the head; that Mr. Johnson's injuries were consistent with having been inflicted by a hammer or similar instrument having a single, flat, round surface; that one of the injuries to Mrs. Johnson's head was consistent with having been inflicted by State's exhibit 26 or by a hammer having similar physical characteristics; that an injury on her face was very consistent with having been inflicted by the claw end of a hammer; and that, if they were conscious when the injuries were inflicted, the victims would have felt substantial pain. He further testified that he examined the injuries that had resulted in Barry Harper's death; that they were similar to those of the Johnsons; and that they too were multiple blunt-force injuries to the head that were consistent with injuries caused by a hammer.
Dr. Downs explained that a piece of Mrs. Johnson's skull (bone tissue) had a distinguishing indentation, which he analogized to a footprint; that, when he received the hammer, he made impressions of its head in molding clay; and that he compared those impressions with the indentation in the piece of bone in Mrs. Johnson's skull. After he showed the jury how he had compared the impressions with the bone, he fit the hammer into the piece of bone to show that the hammer fit into the impressions in Mrs. Johnson's skull.
William H. Jones, a forensic serologist, testified that he studied the blood splatters present at the scene, including those on the ceiling in the room where Mr. Johnson was killed; that the blood impact of Mr. Johnson occurred at a height of approximately two to three feet; that the blood *947 impact of Mrs. Johnson was the area very close to the bed or just above the surface of the bed; that he found the presence of human blood on the upper handle of State's exhibit 26, but the quantity was insufficient to perform other tests (such as DNA) on; that he also found bloodstains at the bedroom door that were not part of the impact splatters, i.e., they were straight-down drops of blood; that the blood in those drops was human blood group A, the same type as Mrs. Johnson's blood; and that his testing of the clothing Crane was wearing that night showed no presence of blood. On cross-examination, Jones testified that he received Crane's clothing nine days after the murders and that the integrity of that clothing and his test results depended on what had been done to that clothing during that nine-day period; that he did not find any hair or tissue on the hammer; and that the presence of blood on the hammer was not just in one spot, but that there was a "thinly smeared area of blood." He also testified that the genetic DNA of the blood on a piece of "blood-soaked" tissue paper found near the hammer did not match McGowan or Mr. or Mrs. Johnson.
Larry Ikner, an investigator for the district attorney's office, testified that the Johnsons' home was located off U.S. Highway 84, in the "Travis Bridge area"; that, on July 21, officers, aided by Crane, searched along County Road 47 near the Johnsons' house and found a hammer, State's exhibit 26, approximately one-tenth of a mile south of the house. On cross-examination, Ikner testified that between $10,000 and $11,000 in locked cabinets and around 20 guns were recovered from the Johnsons' house.
Ronnie Harper, Lois Harper's brother, testified that he introduced McGowan to Barry Harper, his cousin, about four to five months before Harper's murder and that on that occasion McGowan had borrowed $175 from Barry Harper; that McGowan told him that "he was going to go knock [Barry Harper] out"; that one to two weeks before the murders, McGowan asked him if he had ever killed anyone; he told McGowan he had not, then McGowan stated that "he knew where there was a elderly couple lived near Travis Bridge that him and [Ronnie Harper] could kill and get away with it," and that he told him no; and that he was at his sister Lois's house when McGowan and Crane came to the house about 1:00 a.m. on July 19.

Defense Testimony
Mildred Crane, Dedree Crane's mother, testified that McGowan picked Dedree up for lunch on July 18; that Dedree telephoned her the following day from Louisiana and asked her to come get her;, that, on July 27, Alabama Bureau of Investigation ("ABI") Agent Simon Benson came to her house and asked for the clothes Dedree was wearing while she was with McGowan; and that nothing had been done to the clothes since Dedree had worn them.
Simon Benson, an ABI agent, testified that when Crane's mother gave him the clothes that Crane had been wearing, they "had a[n] odor as being dirty."

Sentencing Evidence
The prosecution rested on its offer, and the trial court's admission, of the evidence introduced at the guilt phase, including the exhibits, and the jury's guilty verdicts.
The defense presented the testimony of Dr. Robert deFrancisco, a forensic psychologist and examiner. He testified that McGowan has a full-scale IQ of 76, which, he testified, is "a border line range of intelligence" and a mental age of between approximately 10 and 14; that McGowan is in the ninth percentile in comprehension and reasoning skills; that McGowan's *948 reading level is the beginning of the third grade, which places him in the lower than one percentile. He also testified that McGowan's personality test showed that he did not reflect indicia of an "over-controlled hostility" that would manifest in the commission of very violent crimes; that McGowan is probably not a sociopath; that McGowan has a personality disorder with dependent and antisocial features; that McGowan is very naive, unsophisticated, and impulsive; and that he has poor emotional and intellectual resources (i.e., emotional strength, capacity to understand, intellectual ability, and emotional and cognitive control) and does not think about the consequences of his actions. He further stated that, in his opinion, given McGowan's intelligence level, illiteracy, and emotional makeup, it is unlikely that McGowan could "think ahead and . . . scheme and then plan the get-away"; that given his low IQ, his illiteracy, his lack of "emotional stamina," and his ingestion of a large amount of crack cocaine, which lowers a person's inhibitions, "he could be [led] into things quite easily" and, with the addition of a domineering person of higher intellectual skills, to his deficiencies, it "all certainly adds up to severe problems." He also explained that McGowan's failure to report the crimes could be explained by a number of reasons other than guilt, such as stupidity, fear, panic, lack of resourcefulness, and poor judgment. Dr. deFrancisco further stated that McGowan's injury to the frontal lobes, which is vital to a person's judgment, personality, resourcefulness, and the ability to weigh consequences, was a significant mitigating circumstance because "it would be another reason why [McGowan] has difficulty using judgment in controlling his actions." He also stated that the offenses were committed while McGowan was under the influence of extreme mental or emotional disturbance because the offenses were "done with the strong influence of crack cocaine" and that a person who had had 30 "hits" of crack cocaine in a 6- or 7-hour period would have problems controlling himself; that it was "certainly possible" that McGowan was actually an accomplice in the capital offense, i.e., under the substantial domination of another person, assuming that the other person was more intelligent and resourceful than McGowan; that McGowan's capacity to conform his conduct to the law was substantially impaired because of his frontal-lobe injury and his low IQ; and that his mental age is a mitigating circumstance.
On cross-examination, Dr. deFrancisco testified that McGowan is capable of planning a crime and carrying it out; that having an accomplice would have probably encouraged McGowan's behavior; that he would be able to conceal his actions from other people; that it is unlikely that without help McGowan could have eliminated all the evidence of his having been at the crime scene; and that, even with his limitations, McGowan would have thought to change his bloody clothes and dispose of the murder weapon.
Grover Hicks, the principal of the middle school McGowan attended, testified that, while most of the eighth graders were about 13 years old, McGowan was 16 or 17 when he was in the eighth grade; that he was poor, "retarded somewhat," and "definitely slower academically" than most eighth graders; that he could barely read; that he remained in the tenth grade until he dropped out of school at the age of 20 or 21; that, even when he was the oldest child in the school, he associated with middle-school children; that he was a "follower" and would do prohibited things, such as carry cigarettes belonging to other students, to be accepted by the other students; that he did not fight with or bully *949 other students; and that he "was a good kid."
Melba Mitchell, McGowan's oldest sibling, testified that McGowan is one of five children; that she had to take care of her four siblings because their mother worked in a sewing factory and their father was an alcoholic; that she had quit school when she was 11 years old and married when she was 15; that their father beat the children when he was drunk, which was all the time; that their father beat McGowan from the time McGowan was three years old, even for simple things like getting a slice of bread to eat; that their father beat McGowan sometimes three or four times a week, always with a razor strap; that she remembered when he whipped McGowan with a razor strap until his legs bled when McGowan was six years old; that their father regularly beat the other children, except one; that their mother had men "traipsing in and out" until she ran away with one when McGowan was nine years old; that their mother took their baby sister with her, but abandoned McGowan; that he stayed with their father, but their father left McGowan alone for a month that same year; that, during that month, McGowan had to steal food to eat, his clothes were never washed, and their father would not let the sister take custody of McGowan; that she witnessed a sister, whom McGowan lived with for a while, physically abuse McGowan and because she was afraid of the sister, she left McGowan there; and that, during the time McGowan lived with their stepmother, she starved him and their sister and, when he stole a pickle because he was hungry, the stepmother had McGowan's stepbrothers hold him down while their father whipped him until blood ran down his legs; and that she had never known McGowan to hurt anyone.
Eugene McGowan, McGowan's second oldest sibling, testified that their father physically and verbally abused McGowan, but if that "didn't satisfy him," he would beat McGowan or a sister; that he caught their mother on several occasions with other men in their house; that he escaped his home life by joining the military when he was 15 years old; that he came home on furlough once, to find McGowan, who was 8 or 9, had been living alone for three weeks; that he witnessed one of his sisters hit McGowan and call him a "sorry son of a bitch"; that their stepmother, whom McGowan lived with, was "the filthiest nasty woman [he] had ever seen in [his] life[, e.g.,] she would let chickens and animals in her house to [defecate] on her table"; and that McGowan has never been violent.
Defense counsel, in closing argument, pointed out that the medical records introduced into evidence show that, on July 15, 1994, McGowan asked a doctor to help him with his addiction to prescription drugs.

I.
McGowan contends that the trial court committed reversible error in denying his challenge for cause of venire-member M.A. He argues that M.A. could not have been impartial because she had known Mamie Johnson for 20 years, had worked with her on an assembly line and had conversed with her on a daily basis for 5 years, and considered Johnson her "best friend." He also argues that, by the trial court's improper denial of his challenge for cause of M.A., he was forced to use a peremptory challenge to remove her, thus reducing the number of peremptory challenges he was allowed by law. The State argues that M.A.'s answers to the questions propounded to her on voir dire clearly show that she had no opinion about the case, that she could put aside her relationship with the victim and base her decision *950 on the evidence and the law, and that the trial court did not abuse its discretion in denying the challenge for cause of M.A.
The record includes the following relevant portion of the individual voir dire examination of M.A.:
"Mr. Garrett [defense counsel]: [M.A.], have you read or heard anything about this case? Have you read anything since it happened?
". . . .
"[MA]: Yeah, I read about it in the newspaper and saw it on television.
". . . .
"Mr. Garrett: . . . . Can you tell us what you remember about what you read or saw?
"[M.A.]: That is Ms. Johnson and her husband murdered.
"Mr. Garrett: Do you remember any other details?
". . . .
"[M.A.]: Not at this time.
"Mr. Garrett: Did you know . . . the Johnson family?
"[M.A.]: I knew Mrs. Johnson very well. I worked with her for almost 20 years.
". . . .
"[MA.]: . . . . In the last five or six years that she worked, we worked there close together where we could talk to each other while we was working.
"Mr. Garrett: So, for the last five years that you worked for Lady Arrow, you were . . . on some sort of assemble [sic] line or stacking, is that right? You were right there where you could converse with her on a daily basis and did so, is that right?
"[M.A.]: Right.
"Mr. Garrett: So you had a pretty close relationship with her?
"[M.A.]: Yeah.
"Mr. Garrett: Did you consider her a good friend?
"[M.A.]: Yes, I did.
"Mr. Garrett: Did she consider you a good friend?
"[MA.]: I believe she did.
"Mr. Garrett: The fact that she was a good friend of yours and . . . the feeling was mutual between the two [of] you, would you feel a little uncomfortable sitting on a jury where you have to decide the guilt or innocence of someone that was accused of killing her?
"[M.A.]: Yes, I believe I would be uncomfortable.
". . . .
"Mr. Chapman [district attorney]: [M.A.], could you base your decision on the facts of the case and the evidence and the law as charged by the judge and nothing else?
"[M.A.]: Yeah.
"Mr. Chapman: Could you put aside, if the judge instructed you to do that, could you put aside any relationship that you might have had with Mrs. Johnson and base your decision solely on the evidence of the facts of the law as charged by the judge?
"[M.A]: Yes.
"Mr. Chapman: Would you have difficulty putting it aside?
"[M.A.]: No, I don't think I'd have any difficulty.
"Mr. Chapman: Do you have any preconceived idea about whether this defendant is guilty or not?
"[M.A.]: No.
". . . .
"Mr. Garrett: [M.A.], Ms. Johnson was your best friend, is that right?
"[M.A]: Right.
"Mr. Garrett: And will the fact that you had that relationship, I think you said *951 that would make you feel uncomfortable sitting on this case?
"[M.A.]: Well, I
"Mr. Garrett: What we are looking for, [M.A.], is somebody that is a hundred percent removed from this case that cannot take any feeling that they have about a person . . . outside of the courtroom, you take those into consideration and you might let those feelings affect them to the slightest degree. We need somebody at a hundred percent mutual [sic] in this case.
". . . [D]o you feel like you are the person in light of the relationship that you had with Ms. Johnson? . . . [T]ell us how you feel about it.
"[M.A.]: Well, I really would rattier not be on the jury, but if I do have to be, I think I could be on there without being biased.
"Mr. Garrett: You don't think the fact that you knew the Johnsons would affect your decision just to the slightest degree?
"[M.A.]: No, I don't think it would."
(R. 1049-54.)
"To justify a challenge of a juror for cause there must be a statutory ground (Ala.Code Section 12-16-150 (1975)), or some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court." Nettles v. State, 435 So.2d 146, 149 (Ala.Crim.App.), aff'd, 435 So.2d 151 (Ala.1983). Section 12-16-150 sets out the grounds for removal of veniremembers for cause in criminal cases; however, we find that none of those statutory grounds are applicable in this case. In addition to the statutory grounds, there are other common-law grounds for challenging veniremembers for cause where those grounds are not inconsistent with the statute. Smith v. State, [Ms. CR-97-1258, December 22, 2000] ___ So.2d ___ (Ala.Crim.App.2000), aff'd in pertinent part, rev'd in part, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003); Kinder v. State, 515 So.2d 55, 60 (Ala.Crim.App. 1986). Here, we are dealing with the common-law ground for challenge of suspicion of bias or partiality. See discussion of the common-law grounds for challenge in Tomlin v. State, 909 So.2d 213 (Ala.Crim. App.2002), remanded for resentencing, 909 So.2d 283 (Ala.2003). Ultimately, the test to be applied is whether the veniremember can set aside his or her opinions, prejudices, or biases, and try the case fairly and impartially, according to the law and the evidence. Smith v. State, supra. This determination of a veniremember's absolute bias or favor is based on the veniremember's answers and demeanor and is within the discretion of the trial court; however, that discretion is not unlimited. Rule 18.4(e), Ala. R.Crim. P., provides, in part: "When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case." Even proof that a veniremember has a bias or fixed opinion is insufficient to support a challenge for cause. A prospective juror should not be disqualified for prejudice or bias if it appears from his or her answers and demeanor that the influence of that prejudice or bias can be eliminated and that, if chosen as a juror, the veniremember would render a verdict according to the law and the evidence. Mann v. State, 581 So.2d 22, 25 (Ala.Crim.App. 1991); Minshew v. State, 542 So.2d 307 (Ala.Crim.App.1988).
After reviewing the voir dire examination of MA, we conclude that the trial court did not err or abuse its discretion in denying the challenge for cause. Although MA. had been friends with one *952 of the victims and had worked closely with her for the five years preceding the murders, she stated that she had no preconceived idea as to the guilt or innocence of McGowan, that she could base her decision on the facts of the case and the law as charged by the trial court, and that she could put aside her relationship with the victim and base her decision on the evidence and the law. Although she stated that she had rather not serve on the jury, she said that, if she had to, she could do so without being biased. The fact that a prospective juror knew the victim or the victim's family does not automatically disqualify the prospective juror for cause. Harris v. State, 632 So.2d 503, 521 (Ala. Crim.App.1992), aff'd, 632 So.2d 543 (Ala. 1993), aff'd 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). Unless the prospective juror indicates on voir dire that his relationship with the victim would prevent him or her from being fair and impartial, a challenge for cause should be denied. Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994). In the instant case, the trial court observed M.A.'s demeanor while she was answering questions on voir dire, heard the questions and answers, and was in a better position to determine the truthfulness of her answers and to determine if she harbored any bias in the case. Under the facts here, whether to allow a challenge for cause was the trial court's decision. The court obviously found no bias or prejudice, and we agree. No common-law reason for removing M.A. from the venire has been shown.
McGowan argues that, because he was forced to use one of his peremptory strikes to remove M.A., his right to be tried by an impartial jury was impaired. Because we have found the trial court's refusal to remove M.A. to be proper, we are not compelled to address this argument. However, assuming for the sake of argument that the trial court erred in refusing to grant McGowan's challenge of M.A. for cause, the error would be harmless based on the United States Supreme Court's holding in United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), and the holding of the Alabama Supreme Court in Evans v. State, 794 So.2d 411 (Ala.2000), following Martinez-Salazar. These cases hold that a defendant's right to an impartial jury was not automatically violated merely by an erroneous ruling on a challenge for cause, and so long as the jury that heard the case was impartial, the right to an impartial jury guaranteed by the federal and state constitutions was not violated. The Courts held that the defendant is entitled only to an impartial jury and that unless the defendant can show that a trial court's erroneous ruling during jury selection prevented the jury from being impartial, there was no violation. Here, McGowan made no showing that his right to an impartial jury was probably injuriously affected by the trial court's ruling.

II.
McGowan contends that the trial court erred in denying his pretrial motion for expert DNA assistance to look for forensic evidence that connected Crane to the murder weapon and the victims to support his defense theory that Crane, not him, killed the victims and that he did not possess the intent to kill.
The State indicated, during pretrial discussions, that it had no intention of introducing, during the trial, any evidence of DNA analysis. No DNA evidence was introduced at trial. Pretrial discussions indicated that DNA testing was performed on bloodstains found in McGowan's vehicle and on clothing taken from the car, that the test results were compared to both McGowan's and Crane's blood samples, *953 and that the bloodstains matched McGowan's. The blood found in the Johnsons' residence was determined, by blood-type testing, to be the same type as the victims and not the same type as McGowan or Crane. The hammer that was the murder weapon was examined, but there was an insufficient quantity of uncontaminated blood on the hammer to analyze the blood by DNA testing. DNA testing was to be done on the paper towel recovered near the murder weapon. The prosecutor proclaimed that no test results were exculpatory, and all test results were provided to defense counsel.
During a pretrial hearing on February 23, 1995, the trial court ordered defense counsel to have ready, for the March 21 hearing, the names of at least two DNA forensic experts, their fees, and the type of work to be done by them. At the end of the pretrial hearing on the motion for expert DNA assistance on March 21, 1995, the trial court denied the motion, finding that McGowan had failed to make the threshold showing required by Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). However, the trial court stated that, depending on the results of the tests on the paper towel, the defense might be entitled to a DNA expert. During a pretrial hearing on April 20, 1995, both the trial court and the prosecutor stated that they thought the trial court had granted the motion. After a lengthy discussion, the trial court ordered defense counsel to give the court a written motion, within two weeks, listing what counsel needed from a DNA expert, explaining in very specific terms exactly why counsel needed a DNA expert, and incorporating the results of the tests already performed. Defense counsel did not file a supplemental motion as ordered by the trial court. Thus, we find that, in not pursuing the DNA expert, defense counsel decided one was not needed.
In further considering the issue under the plain-error standard, we have applied the following to the facts presented:
"In [Ex parte] Moody, [684 So.2d 114 (Ala.1996),] the Alabama Supreme Court defined the standard by which a trial court must assess an indigent defendant's request for expert assistance.
"`Although the [United States] Supreme Court has not specifically stated what "threshold showing" must be made by the indigent defendant with regard to the need for an expert, the. Court refused to require the state to pay for certain experts when the indigent defendant "offered little more than undeveloped assertions that the requested assistance would be beneficial." Caldwell v. Mississippi, 472 U.S. 320 at 323, 105[,] S.Ct. 2633 at 2637, 86 L.Ed.2d 231 (1985). As we stated in Dubose [v. State, 662 So.2d 1189 (Ala.1995)] the Supreme Court cases of Ake [v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)] and Caldwell, viewed together, seem to hold that an indigent defendant must show more than a mere possibility that an expert would aid in his defense. "Rather, the defendant must show a reasonable probability that an expert would aid in his defense and [must show that] a denial of an expert to assist at trial would result in a fundamentally unfair trial." Dubose, 662 So.2d at 1192, citing Moore v. Kemp, 809 F.2d 702 (11th Cir.), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).
"`. . . .
"`Based on the foregoing, we conclude that for an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert *954 would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense.'
"684 So.2d at 119. See also Burgess v. State, [723] So.2d [742] (Ala.Cr.App. 1997); MacEwan v. State, 701 So.2d 66 (Ala.Cr.App.1997); Ex parte Dobyne, 672 So.2d 1354, 1357 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996)."
Finch v. State, 715 So.2d 906, 910-11 (Ala. Crim.App.1997).
In this case, the trial court gave McGowan opportunities to make the required showing, but he did not satisfy his burden of proof. We find no plain error, especially where the State did not present any DNA evidence at trial and the blood on the hammer was of insufficient quantity and was contaminated and could not produce DNA evidence.

III.
McGowan contends that the trial court's "reasonable doubt" instruction violated his "right to due process and a reliable sentencing determination protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama state law" (McGowan's brief, p. 17) because, he argues, there was a reasonable likelihood that the jurors understood that instruction to allow them to convict on proof insufficient to meet the standard of In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). McGowan's argument is directed at the following emphasized portion of the court's oral charge:
"The phrase, `reasonable doubt,' is self explanatory, i Efforts to define it do not always clarify the term but it may help to note, that it is so not a mere possible doubt. Everything relating to human affairs is open to some possible or imaginary doubt. A reasonable doubt is a doubt of a fair minded juror honestly seeking the truth after careful and impartial consideration of all evidence in the case. This based upon reason and common sense is a doubt for which a rational explanation and a reason for having it can be given. It does not mean a vague or arbitrary notion, but is an actual doubt, based upon the evidence or part of the evidence, the lack of evidence, a conflict in the evidence or some combination thereof. It's the doubt that remains after going over in your minds the entire case and giving consideration to all the testimony. It would be distinguished and is different from mere possibility, bare imagination or fanciful conjecture."
(Emphasis added.) McGowan did not object to this instruction. Therefore, we review it under the plain-error standard. Rule 45A, Ala. R.App. P.
Pursuant to the following discussion in Smith v. State, [Ms. CR-97-1258, December 22, 2000] ___ So.2d ___ (Ala.Crim. App.2000), aff'd in pertinent part, rev'd in part, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003), we find that McGowan's argument is without merit:
"The appellant . . . contends that the trial court's jury instruction on reasonable doubt violated Cage v. Louisiana, 498 U.S. 39 (1990), because it stated, `[T]he doubt which would justify an acquittal *955 in this case must be a doubt for which you have a reason arising from all the evidence or lack of evidence. . . .' (R. 1835-36.)
"The appellant is correct in his assertion that other jurisdictions have condemned such an instruction. See both state and federal cases cited in Adams v. South Carolina, 464 U.S. 1023, 1025-26 & nn. 3-4 (1983) (Marshall and Brennan, JJ., dissenting from denial of certiorari review), wherein Justice Marshall stated:
"`I continue to believe that trial courts err when they instruct juries that a reasonable doubt means "a substantial doubt" or "a strong and well-founded doubt" or "a doubt for which you give a reason." The Fourteenth Amendment requires prosecutors to prove beyond a reasonable doubt every element of a crime. In re Winship, 397 U.S. 358. . . . [W]hen a jury is told that a reasonable doubt is a doubt that can be articulated, the prosecutor's burden of proof is unconstitutionally eased.'
"Id. at 1025. See also Butler v. South Carolina, 459 U.S. 932, 935 n. 3 (1982) (Marshall, J., dissenting from denial of certiorari review) (`Many courts have disapproved the requirement that a juror be able to articulate a reason for his doubt.').
". . . .
"We . . . find this issue to be without merit under Alabama caselaw. The appellant argues this instruction met the standard expressed in Cage v. Louisiana for unconstitutionality: whether `a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.' 498 U.S. at 41. However, this standard of review for jury instructions on reasonable doubt has been supplanted by the following: `"whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. Boyde v. California, 494 U.S. 370, 380 (1990).' Estelle v. McGuire, 502 U.S. 62, 72 (1991). We now follow this standard. Ingram v. State, 779 So.2d 1225 (Ala. Crim.App.1999). `The constitutional question in the present case[ ], therefore, is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the [In re] Winship [, 397 U.S. 358 (1970)] standard.' Victor v. Nebraska, 511 U.S. 1, 6 (1994).
"Alabama courts have held that the statement that a reasonable doubt is a doubt for which a reason can be given does not violate Cage and does not improperly lessen the prosecution's burden of proof. Jackson v. State, 836 So.2d 915, 949 (Ala.Crim.App.1999), citing Ex parte McWilliams, 640 So.2d 1015, 1023-24 (Ala.1993); Burgess v. State, 827 So.2d 134 (Ala.Crim.App.1998), aff'd, 827 So.2d 193 (Ala.2000). See also Ex parte Taylor, 666 So.2d 73, 82-85 (Ala. 1995), disagreed with on other ground, Ex parte Borden, 769 So.2d 950 (Ala. 2000); Stewart v. State, 730 So.2d 1203, 1232 (Ala.Crim.App.1996), aff'd, 730 So.2d 1246 (Ala.1999); Bush v. State, 695 So.2d 70, 114-15 (Ala.Crim.App. 1995), aff'd, 695 So.2d 138 (Ala.1997). The court in Burgess, reviewing for plain error the instruction `[a] reasonable doubt is one for which a good reason can be given,' explained:
"`The instruction, taken as a whole, was used to explain to the jury the principle that a doubt cannot arise from speculation, surmise, or conjecture, but must be based on the evidence *956 or a lack thereof. The trial court's instruction did not require that a juror be able to articulate a specific reason for its doubt, but rather that it be a doubt for which a reason could be recognized. The instruction to the jury made it clear that it was to render a verdict based upon a careful consideration of the evidence. [T]he use of the term "good reason" [did not mislead] the jury into believing that a higher or different burden of proof than "beyond a reasonable doubt" was required for its deliberations.'
"827 So.2d at 180. For cases specifically finding, under the new standard, that instructions containing the `a doubt for which you have a reason' language did not present plain error, see Boyd v. State, 715 So.2d 825, 843-44 (Ala.Crim. App.1997), aff'd, 715 So.2d 852 (Ala. 1998); Williams v. State, 710 So.2d 1276, 1334-55 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997).
"Taking the trial court's instructions in their entirety, as we are required to do, we find that there is no reasonable likelihood that the jury applied the instructions concerning reasonable doubt in such a way as to violate the appellant's constitutional rights. As a whole, the instructionsincluding those on the presumption of innocence, burden of proof, and weighing of the evidence correctly conveyed to the jury the proper concept of reasonable doubt. We find no plain error."
___ So.2d at ___ (footnotes omitted). See also Lee v. State, 898 So.2d 790, 808 (Ala. Crim.App.2003) (opinion on return to remand). Cf. Tomlin v. State, 909 So.2d 213 (Ala.Crim.App.2002); Broadnax v. State, 825 So.2d 134, 197-99 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001). We further hold that the instruction did not shift the burden of proof to McGowan. See Dorsey v. State, 881 So.2d 460 (Ala.Crim. App.2001), rev'd on other ground, 881 So.2d 533 (Ala.2003).
Based on the foregoing, we find that the trial court's "reasonable doubt" instruction did not constitute plain error.

IV.
McGowan asserts that "[t]he trial court violated Alabama law by improperly allowing the jury to consider statements allegedly made by Mr. McGowan that were too remote and too general to be admissible." (McGowan's brief, p. 17.) He argues, "[T]he trial court improperly allowed the jury to draw the highly speculative and prejudicial inference that, based on these generalized statements, Mr. McGowan had specific intent to commit the crime for which he was convicted." (McGowan's brief, p. 18.)
McGowan filed a motion in limine, seeking to prohibit the State from eliciting testimony of his statements to Ronnie Harper. The trial court, in denying his objection, indicated that the ruling was final and, thus, McGowan did not have to object at trial.
McGowan is referring to two statements he made to Ronnie Harper. Harper testified that, four to five months before the murders of the Johnsons and Barry Harper, he took McGowan to see Barry, his cousin, so that McGowan could obtain a $175 loan from Barry; that Barry did not know McGowan, but after Ronnie vouched for McGowan, Barry loaned McGowan the money; and that, that evening, McGowan told him that "he was going to go knock [Barry] out." Harper also testified that, one to two weeks before the murders, McGowan asked him if he had ever killed anyone; that, after he replied no, McGowan told him that "he knew where there was a elderly couple lived near Travis Bridge *957 that him and me could kill and get away with it"; and that he had said no.
We find that the following discussion is dispositive of McGowan's claim:
"The appellant alleges that the trial court erred to reversal in permitting a prosecution witness, Michael Vann Riggs, to testify as to statements that the appellant made to Riggs before the commission of the crime. Specifically, the appellant asserts that the testimony was inadmissible because, he claims, the appellant's `alleged statements were too remote and too general for a jury to draw a permissible inference from them about [his] intent.' (Appellant's brief, p. 11).
"Riggs testified that he worked for the appellant in the summer of 1993.[[3]] In the early part of July 1993, the appellant told him that `he knew where somebody could make a good lick, but you'd have to kill the son of a bitch.' (R. 1881.) Riggs interpreted `lick' to mean a robbery. Riggs further testified:
"`He told me that it was an old man [who ran] a salvage yard on 24, and he kept a good bit of money, but you would have to kill him because he would not give it up. I don't know if that's, you know, altogether how he said it, you know, but that's what it all boiled up to. HeI'm sure that he said you would have to kill the son of a bitch, he would not give it up and he kept a good bit of cash on him. And heit was on Highway 24.'
"(R. 1884.)
"The appellant argues that because Riggs was unsure whether he recalled the conversation exactly as it had occurred, that because Riggs could not be sure of the date of the appellant's statement, and that because the appellant did not mention the victim by name in his statement, Riggs's testimony was too remote and too general to be relevant, and, that it was therefore, inadmissible. We disagree.
"In Oryang v. State, 642 So.2d 989 (Ala.Cr.App.1994), the defendant was charged with attempted murder. The trial court allowed a prosecution witness to testify that the defendant told him that `one day he was going to kill someone "for the hell of it."' 642 So.2d at 996. The defendant made this statement to the witness sometime in 1990, and the shootings did not occur until December 1991.
"This Court found that the trial court properly admitted the statement. We held:
"`[T]he testimony concerning the appellant's statement that one day he was going to kill someone "for the hell of it," was relevant and not too remote. The appellant argues that he lacked the requisite intent to commit this offense . . .; thus this prior statement was clearly relevant to prove that the appellant intended to murder individuals "for the hell of it" or randomly, such as by shooting into passing vehicles. But see Roberson v. State, 339 So.2d 100, 102-03 (Ala.Cr. App.), cert. denied, 339 So.2d 104 (Ala. 1976) (wherein the defendant's prior statement that he wanted a third party to go with him on a robbery of a McDonald's restaurant was held not to be relevant in a case involving the robbery of a McDonald's restaurant two months following the appellant's statement, because the plans for the actual robbery were made subsequent to the statement, and the prior statement "did not refer to any particular *958 McDonald's but only to `a McDonald's.'" Id. at 103.)
"`Moreover, "[t]he rule is stated to be that the acts, declarations and demeanor of an accused before or after the offense whether a part of the res gestae or not are admissible against him, but unless a part of the res gestae are not admissible for him." Smoot v. State, 381 So.2d 668, 671 (Ala.Cr.App.1980), and cases cited therein.
"`The trial court did not abuse its discretion in allowing this prior statement made by the appellant into evidence against the argument that it was too remote. In White v. State, 380 So.2d 348 (Ala.Cr.App.1980), this court held that evidence that a defendant, who was charged with the murder by shotgun of his wife, had cut his wife prior to the offense was admissible and not too remote, although the only evidence presented as to the date of the prior cutting was that it occurred "`a long time ago.'" In holding that the trial court did not abuse its discretion in allowing this evidence, this court stated:
"`"`Ordinarily, remoteness of time affects the weight and probative value of evidence rather than its admissibility. It rests largely in the enlightened discretion of the court whether or not such proof will be allowed. Remoteness has regard also to factors and considerations other than mere lapse of time. It results, therefore, that it is practically impossible and not at all accurate to attempt to state a fixed rule or standard with particular reference to the time element. Of course it can be said with certainty that the tendered evidence must not be so remote in point of time as to be without causal connection or logical relation to the main event. Notwithstanding evidence may be logically relevant, its admissibility does not follow unless it has some probative value to the inquiry of instant concern.'
"`"Smitherman v. State, 33 Ala. App. 316, 318-319, 33 So.2d 396 (1948).
"`"Remoteness with respect to the admissibility of evidence is a relative idea and varies in its application according to the facts of each case. Dorch v. State, 40 Ala.App. 475, 476, 115 So.2d 287 (1959).
"`"While remoteness of time alone does not render the prior event inadmissible, Fields v. State, 362 So.2d 1319, 1320 (Ala.Cr.App.1978), the trial court `is without discretion to admit a statement that is so remote as to time or circumstances that its relevance or materiality must rest in conjecture and speculation.' Roberson v. State, 339 So.2d 100, 104 (Ala.Cr. App.), cert. denied, 339 So.2d 104 (Ala. 1976).
"`"`Whether evidence offered is too remote to be admissible is for the court, in the exercise of a sound discretion, and such ruling will not be revised on appeal unless it is plain that error was committed. However, where the competency of evidence is doubtful, the better practice is to allow the evidence to go to the jury, leaving them to determine its weight and credibility. That is to say, if the evidence tends to prove a fact for determination by the jury, however slight the evidence may be, it is relevant.'
"`"Sorrell v. Scheuer, 209 Ala. 268, 269, 96 So. 216, 217 (1923). (Citations omitted.)

*959 "`"See also Pitts v. State, 261 Ala. 314, 316, 74 So.2d 232 (1954)." "`White v. State, 380 So.2d at 350. See also Lundy v. State, 539 So.2d 324, 331 (Ala.Cr.App.1988) (wherein this court held that the trial court did not abuse its discretion in holding admissible the substance of conversations by the defendant that allegedly had occurred approximately one and one-half to two years prior to the offense at hand).'
"Oryang, 642 So.2d at 997-98 (Emphasis added in Oryang).
"This situation is distinguishable from the case of Roberson v. State, 339 So.2d 100 (Ala.Cr.App.1976), cited by the appellant, and noted in Oryang, supra. In that case, the defendant's statement to a third party that he wanted that person to go with him to rob a McDonald's restaurant was too remote because the statement occurred some months prior to the actual robbery of the McDonald's and because it was merely a general solicitation to rob a McDonald's, not the particular McDonald's that was actually robbed. In this case, the appellant's statement was close in time to the crime and it contained specific details that were consistent with the description of the victim. It was not merely a generalized statement that the appellant wanted to rob someone.
"Accordingly, the trial court did not abuse its discretion in allowing Riggs to testify regarding statements the appellant had made to him prior to the crime.
"Riggs's testimony concerning what the appellant told him was also correctly admitted because the appellant's statement constituted a threat against the victim.
"`In a charge of homicide or assault, a threat by the accused to kill or injure the victim is admissible as tending to show a design in the accused to commit the crime, and hence, as tending to show the accused's commission of the crime. Some courts have held such threats admissible as tending to show malice or intent on the part of the accused. While remoteness is always a basis for excluding evidence in extraordinary circumstances as determined within the discretion of the trial court, the decisions reflect that such a threat is admitted no matter how much time has elapsed between it and the homicide or assault.
"`. . . .
"`A threat not directed toward the victim is not admissible in a present criminal prosecution. A vague threat against no person in particular, for example, is not admissible against the accused unless accompanied by evidence warranting an inference that the threat was directed against the victim. Although the victim is not named in the threat, if the evidence of other circumstances warrants an inference that it was directed against the victim or a class of which the victim was a member, then the threat is admissible.'
"C. Gamble, McElroy's Alabama Evidence, § 44.02(1) (5th ed.1996). (Footnotes omitted.) See also Wilson v. State, 690 So.2d 449 (Ala.Cr.App.1995), aff'd in part, quashed in part, 690 So.2d 477 (Ala.1997); Childers v. State, 607 So.2d 350 (Ala.Cr.App.1992), opinion after remand, 640 So.2d 15 (Ala.Cr.App.), rev'd on unrelated ground, 640 So.2d 16 (Ala.1994); Cowart v. State, 579 So.2d 1 (Ala.Cr.App.1990). Here, sufficient evidence was presented from which one could reasonably infer that the appellant's threat was directed toward the victim."
*960 Drinkard v. State, 777 So.2d 225, 243-46 (Ala.Crim.App.1998), rev'd on other ground, 777 So.2d 295 (Ala.2000).
Based on the foregoing, we find that the admission of Ronnie Harper's testimony concerning McGowan's statements was not error.

V.
McGowan contends that the trial court erred in allowing the State to introduce evidence that he killed Barry Harper, that he used crack cocaine on the night of the crimes, and that he kidnapped Crane.[4] He submits that that evidence was improper and highly prejudicial because, he argues, it was used solely to establish that he had the propensity to commit crimes.
Although McGowan filed a motion in limine to prevent the State from introducing evidence of McGowan's involvement in the murder of Harper, the denial of a motion in limine does not preserve any claim for appellate review, and McGowan did not obtain the express acquiescence of the trial court that an objection at trial was not necessary. See Perkins v. State, 808 So.2d 1041, 1085 (Ala.Crim.App. 1999), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other ground, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). At trial, McGowan did not object to testimony pertaining to his drug use on the night of the Johnson murders or testimony allegedly pertaining to his kidnapping Crane. His objections to the evidence of the murder of Harper were supported either by the assertion that the autopsy of Harper's body had "nothing to do with this," by the claim that the objection was based on previous grounds stated, or by no ground. These objections were insufficient. Moreover, McGowan's motion for a mistrial was directed at Dr. Wagner's testimony regarding the fact that Harper suffered stab wounds and gnawing wounds that appeared to be caused by an animal and those wounds were not similar to the Johnsons' wounds. We find that the claim now presented was not adequately raised before the trial court, and, thus, we review this issue for plain error, Rule 45A, Ala. R.App. P.
In Ex parte Windsor, 683 So.2d 1042 (Ala.1996), Windsor argued that the trial court erred in allowing the State to offer evidence, in his capital-murder prosecution, indicating that he had participated in another robbery-murder. In rejecting this claim, the Court noted that the two robbery-murders occurred on the same day, only hours apart; that both victims were owners of convenience stores; and that the crimes were factually similar. The Court adopted this court's analysis of the evidence:
"`"`Evidence of the accused's commission of another crime is admissible if such other crime is inseparably connected with or is a part of the res gestae of the now-charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence.' C. Gamble, McElroy's Alabama Evidence (3d ed.1977), § 69.01(3). See also Orr v. State, 462 So.2d 1013, 1015 (Ala.Cr.App. 1984). `Evidence of other crimes is properly admissible as part of the res gestae if all of the criminal acts are part of one continuous criminal adventure by *961 the same party occurring within a matter of hours. Miller v. State, 405 So.2d 41 (Ala.Cr.App.1981). See also Moseley v. State, 357 So.2d 390 (Ala.Cr.App. 1978); Summers v. State, 348 So.2d 1126 (Ala.Cr.App.), cert. denied, 348 So.2d 1136 (Ala.1977).' Pettaway v. State, 494 So.2d 884, 886 (Ala.Cr.App.1986). In the present case, this evidence `was intimately connected with the same transaction which is the basis of the State's case. . . . The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge.' Blanco v. State, 515 So.2d 115, 120 (Ala.Cr.App. 1987), and cases cited therein. `The trial court did not err in overruling appellant's objection to the admission of such evidence. No matter how many distinct crimes may be involved, all the details of one continuous criminal occurrence or adventure may be given as part of the offense with which the defendant is charged.' Coleman v. State, 487 So.2d 1380, 1385 (Ala.Cr.App.1986), and cases cited therein."
"`Rowell v. State, 570 So.2d 848, 852 (Ala.Cr.App.1990).
"`The evidence presented at trial tended to show that the robbery-murder in this case and the robbery-murder of Mr. Pepper were part of a continuous criminal adventure. Each robbery-murder was committed in a similar manner on the same day. It was not error to receive evidence of another criminal act that was a part of a continuous criminal spree. Rowell, 570 So.2d at 852.'"
683 So.2d at 1052-53 (quoting Windsor v. State, 683 So.2d 1027, 1035 (Ala.Crim.App. 1994)). See also Centobie v. State, 861 So.2d 1111 (Ala.Crim.App.2001).
In the case before us, the trial court made the following pertinent observations:
"That was all part of one continuous transaction with the exact same motive involving the same participates [sic], involving the same type of murder weapon and involving the same type of injuries to the victims, all occurring on the same day."
We agree. The evidence established that, between 6:00 p.m. and 7:00 p.m., on July 18, 1994, McGowan murdered Harper to get money to buy crack cocaine and that the murder weapon was a hammer; that McGowan borrowed a hammer from the Porters about 10:00 p.m. on July 18; and that, before 1:00 a.m. on July 19, the Johnsons were murdered and the Porters' hammer was the murder weapon, and McGowan and Crane found Rerun and gave Rerun money for crack cocaine. See also Cothren v. State, 705 So.2d 849, 860 (Ala.Crim.App.) ("The facts of this case clearly establish that the collateral capital offenses were part of a continuous crime spree. There were overwhelming similarities in the charged crime and the collateral offense. . . . The appellant and his codefendants exhibited a distinctive method of criminal activity in each murder."), aff'd, 705 So.2d 861 (Ala.1997).
Moreover, we find that the evidence of Harper's murder and of McGowan's use of crack cocaine was relevant to the element of intent. McGowan presented a two-pronged defense: (1) that he remained outside while Crane murdered the Johnsons, but (2) that, if he did kill the Johnsons, his use of crack cocaine prevented him from forming the intent necessary to support a conviction for capital murder or murder and the jury could find him guilty of only manslaughter. Because each prong called into question his intent to murder the Johnsons with the hammer he procured after Harper's murder, his prior actions were relevant to prove his intent. Moreover, the evidence of McGowan's. *962 drug use was used in the presentation of his defense.
Furthermore, the evidence of Harper's murder and of McGowan's use of crack cocaine was relevant to prove motive. (In asserting that Crane killed the Johnsons, McGowan argues that Crane, not he, was compelled by a drug addiction.) Evidence tending to establish motive is always admissible. Perkins v. State, 808 So.2d 1041, 1084 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other ground, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). See also Rule 404(b), Ala. R. Evid.; 1 Charles W. Gamble, McElroy's Alabama Evidence § 70.01(12)(e). "If the prior bad act falls within this exception, and is relevant and reasonably necessary to the State's case, and the evidence that the accused committed that act is clear and conclusive, it is admissible." Boyd v. State, 715 So.2d 825, 838 (Ala.Crim.App. 1997), aff'd, 715 So.2d 852 (Ala.1998).
In finding no error, much less plain error, we make the following conclusions: the evidence in question was material, relevant, and reasonably necessary to the State's case; it clearly fell within at least one exception to the exclusionary rule; and its probative value was not outweighed by its prejudicial effect. Finally, the trial court's limiting instructions, given during Crane's testimony and during the oral charge to the jury, were sufficient to inform the jury of its responsibilities in considering the collateral-crimes evidence.

VI.

A.
McGowan contends that the trial court committed reversible error by denying defense counsel's oral motion on April 16, 1996, to continue, which was based on the ground that they had not had adequate time to prepare for trial.
Attorneys Broox Garrett and Ed Hines were appointed on November 15, 1995, after previous counsel withdrew because of a conflict of interest. They received the case file on December 19, 1995. Garrett and Hines were also serving as McGowan's defense counsel in the Harper case. The trial court made findings that Garrett and Hines were already very familiar with the Johnsons' capital murder because the capital cases relating to the murders of the Johnsons and the murder of Harper were intertwined; that discovery materials had been shared in the two cases; and that "a lot of work" had already been done by previous counsel, including much investigation and argument of almost all motions. The record contains no showing that defense counsel were not prepared for the trial, which began on April 22, 1996.
We find no error in the trial court's denial of defense counsel's motion to continue. Defense counsel did not assert any specific relevant witness or evidence that would have been available to them had they been granted a continuance. They merely asserted that they had had insufficient time to prepare. But see Burgess v. State, 827 So.2d 134, 178 (Ala.Crim.App.1998)("Counsel's belief that they would have been better prepared with more time is a belief shared by every trial judge and lawyer who has ever been involved in a trial."), aff'd 827 So.2d 193 (Ala.2000).
"The trial court has broad discretion in granting a continuance when the basis for the motion is that counsel has not had sufficient time to prepare or to develop his defense. Godfrey v. State, 383 So.2d 575, 577 (Ala.Cr.App.), cert. denied, 383 So.2d 579 (Ala.), cert. denied, 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980), citing Smith v. State, 282 Ala. 268, 210 So.2d 826 (1968). `A motion for a continuance due to a lack of *963 time for adequate preparation is a matter entirely and exclusively within the sound discretion of the trial court and its ruling will not be reversed on appeal absent a . . . showing of abuse.' Reynolds v. State, 539 So.2d 428, 429 (Ala.Cr. App.1988), cert. denied, 539 So.2d 428 (Ala.1989). Moreover, `[t]he reversal of a conviction because of the refusal of the trial judge to grant a continuance requires "a positive demonstration of abuse of judicial discretion." Clayton v. State, 45 Ala.App. 127, 129, 226 So.2d 671, 672 (1969).' Beauregard v. State, 372 So.2d 37, 43 (Ala.Cr.App.), writ denied, 372 So.2d 44 (Ala.1979) (emphasis added [in Loggins])."
Loggins v. State, 771 So.2d 1070, 1084 (Ala.Crim.App.1999), aff'd, 771 So.2d 1093 (Ala.2000).
The circumstances present no such abuse of discretion by the trial court. Accordingly, we find no error.

B.
McGowan contends that the trial court erroneously denied his pretrial discovery request that the State produce its file on the 1987 murder of Vickie Lynn Pittman because, he argues, it could have supported the defense theory that Crane murdered the Johnsons. He states, "If Mr. McGowan had access to the . . . Pittman file, he could have . . . presented evidence that Dedree Crane had participated in another murder with strikingly similar circumstances." (McGowan's brief, p. 27.)
Karen Kelly, who was Crane's roommate at the time, and Ralph Myers confessed to, pleaded guilty to, and were convicted of the Pittman murder. During the hearing on McGowan's motion, ABI Agent Simon Benson testified that Pittman was last seen alive on February 22, 1987; that Myers confessed to using a "bumper jack" as the murder weapon and took the officers to the location where he had discarded it; that neither defendant implicated Crane and nothing even hinted that she had been involved in any way; that, after the investigation was over and Crane's father was removing all of Kelly's and Crane's personal belongings from Kelly's apartment, he found a hammer, which was wrapped in old curtains belonging to Kelly; that Crane's father saw a red substance on the hammer, so he gave the hammer to Benson; that Benson submitted the hammer for testing and it "gave positive screening tests for blood," but "[f]urther species identification tests gave inconclusive results"; that the hammer was never associated with the Pittman murder and Crane was not a suspect in that murder; and that she had been in jail from February 18, 1987, until mid-March 1987, for marijuana possession and attempting to elude officers. (The prosecutor furnished defense counsel Crane's jail record showing that she was incarcerated when Pittman was murdered.)
One of Pittman's aunts testified that she last saw Pittman on March 1, 1987, and that Pittman was in a blue Monte Carlo automobile with two other women. One of Kelly's neighbors testified that Kelly drove a blue Monte Carlo with a white top. Another of Pittman's aunts testified that Agent Simon repeatedly told her that Crane was a suspect in the Pittman murder and also told her that the other aunt's description of the woman seen in the vehicle with Pittman matched the description of Crane.
We find that the trial court properly denied McGowan's motion. "As a general rule, accused is not entitled to the production of records the relevance of which was far removed from the dispute before the court." 22A C.J.S. Criminal Law § 495 (1989) (footnote omitted). We agree with the prosecutor's argument that the following *964 facts were not contradicted: that two other people confessed to and were convicted of the Pittman murder; that a hammer was not the weapon used in that murder; that one of the defendants led law-enforcement officers to the weapon used; that in the confessions the defendants did not mention Crane; and that Crane was in jail when the murder occurred. These uncontradicted facts "far remove" the relevance of the Pittman file from the prosecution for the Johnsons' murders.
McGowan also contends that the trial court erred in denying his request that blood tests be ordered for Crane, her children, and Agent Simon Benson to establish the paternity of Crane's children. This motion was based on the theory that Benson and Crane had been involved in an intimate relationship and that the tests would demonstrate that Benson was the father of one of Crane's children and was therefore biased in favor of Crane. Benson denied, under oath, having had a sexual relationship with Crane or ever having been alone with her. McGowan did not present a factual basis for an order for paternity testing. Accordingly, the trial court properly denied McGowan's request.

C.
McGowan asserts that his constitutional rights were violated by the trial, court's allowing the jury to separate, over his objection, in violation of Rule 19.3(a)(1), Ala. R.Crim. P. At the time McGowan was tried, Rule 19.3(a)(1) provided: "In any prosecution for a capital felony, upon the consent in open court of the defendant, defendant's counsel, and the district attorney, the trial court, in its discretion, may permit the jury trying the case to separate during the pendency of the trial. . . ."[5]
After the jury was selected and sworn, the trial court allowed the jurors to return to their homes for approximately an hour, to gather necessities to be sequestered upon their return to the courthouse. The court, before allowing the jurors to leave, instructed the jurors to refrain from discussing the case, to avoid any media coverage, and to refrain from referring to extraneous information, such as a reference book. The jury was sequestered from opening arguments until the sentencing recommendation.
Contrary to McGowan's argument, the trial court acted pursuant to § 12-16-9, Ala.Code 1975, amended effective June 15, 1995, which provides, in pertinent part:
"In the prosecution of any felony case the trial court in its discretion may permit the jury hearing the case to separate during the pendency of the trial. The court may at any time on its own initiative or on motion of any party, require that the jury be sequestered under the charge of a proper officer whenever they leave the jury box or the court may allow them to separate."
See Ex parte Stewart, 730 So.2d 1246 (Ala. 1999) (holding that § 12-16-9 overrode the conflicting portions of Rule 19.3 and eliminated the need for an agreement to separate the jury in capital cases). See also Ex parte Drinkard, 777 So.2d 295 (Ala. 2000); Ex parte Smith, 756 So.2d 957 (Ala. 2000); Centobie v. State, 861 So.2d 1111 (Ala.Crim.App.2001).
Accordingly, the trial court had complete discretion to sequester the jury, and the consent of McGowan and defense counsel was not a prerequisite for the trial *965 court's decision to allow the jury to separate for that short time. We find no abuse of discretion.

D.
McGowan asserts that the trial court erred in denying his motion to control pretrial publicity. In that motion, he asked the court to order that the file be sealed, that all proceedings before jury sequestration be closed, that all participants be prohibited from releasing information to the media, and that videotaping of any court proceeding be prohibited. The court granted the last two requests. (See CR. 63, R. 175; Suppl. R. 89.)
In denying the remainder of the motion, as to excluding the media from pretrial hearings, the trial court noted that, in the January 31 and February 23, 1995, hearings, the Evergreen weekly newspaper had not sent a reporter and that "this case, at this point [February 23, 1995], has not been such a high profile case that I think there is any danger by the media covering it." McGowan renewed his motion four days before trial on the ground that an article in the newspaper, dated the day before, reported the trial court's ruling that evidence of the Harper murder would be admissible at trial and noted that "outraged friends . . . called for the death penalty for [the Johnsons'] killers." The record contains no ruling on this motion. At the beginning of the second day of jury selection, defense counsel again asked for a change of venue because of the news article referred to above and a radio show that morning. The trial court, at McGowan's request, again ordered the attorneys, including all personnel of the district attorney's office, and the parties to refrain from discussing the case. The prosecutor also pointed out that all veniremembers had been instructed the previous day to avoid all media and not to discuss the case.
The Alabama Supreme Court held, in Ex parte Consolidated Publishing, Co., 601 So.2d 423, 433 (Ala.1992), that the First Amendment right to access to criminal proceedings applies to pretrial hearings and to the court file of those proceedings. "While each case must be decided on its own facts, there is a presumption in favor of openness." Ex parte Birmingham News Co., 624 So.2d 1117, 1125 (Ala. Crim.App.1993). See also Rule 9.3(b), Ala. R.Crim.P. ("All proceedings shall be open to the public, unless otherwise provided by law.").
In asserting that his fair trial rights will be violated unless the proceedings and the court file are closed, a defendant "must present evidence that will support specific findings that there is a substantial probability that his right to a fair trial will be prejudiced by publicity that closure would prevent and that reasonable alternatives to closure cannot adequately protect his fair trial rights." Ex parte Consolidated Publishing, Co., 601 So.2d at 433. A request for closure of all proceedings and sealing of the entire court file was too broad under the facts before this court. Here, the trial court took other steps to adequately protect McGowan's right to a fair trial: proscribing extrajudicial statements by any attorney and videotaping of any court proceeding. As we discuss in Part VI.H., infra, McGowan did not show that the pretrial publicity so saturated the community that prejudice should be presumed, and he did not show that the venire was actually prejudiced against him.
A trial court's decision on a motion for closure is reviewed applying an abuse-of-discretion standard. Ex parte Birmingham News Co. Inc., 624 So.2d at 1126. "Any court should be extremely reluctant to order the closure of any criminal *966 proceeding." Id. at 1135. We find that the actions taken by the trial court and those the trial court refused to take were well within its discretion. Accordingly, we find no error.

E.
McGowan contends that the trial court erred in denying his pretrial discovery request for the felony-conviction records of all State's witnesses. The trial court granted McGowan's request only in regard to the criminal record of Crane, McGowan's accomplice. However, the prosecutor subsequently told defense counsel that he was delivering to defense counsel, that day, a list of any felony convictions of any State's witnesses. (R. 532-34.) There is no showing that McGowan did not receive the requested information.
We also address this issue in the alternative: McGowan contends that the trial court's ruling violated "his right to material evidence under Brady v. Maryland 373 U.S. 83 (1963), and violated Alabama discovery rules under Ex parte Monk, 557 So.2d 832 (Ala.1989)." (McGowan's brief, p. 33.)
"We have held in Alabama in a number of cases that a defendant is not entitled to the general disclosure of the criminal records of the state's witnesses. See, e.g., Davis v. State, 554 So.2d 1094 (Ala.Crim.App.1984), aff'd, 554 So.2d 1111 (Ala.1989), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991); Wright v. State, 424 So.2d 684 (Ala.Crim.App.1982) (no absolute right of disclosure of criminal records of state's witnesses); Mardis v. State, 423 So.2d 331 (Ala.Crim.App.1982); Mack v. State, 375 So.2d 476 (Ala.Crim.App. 1978), aff'd, 375 So.2d 504 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1134 [(1980)]. We have also held that the trial court's refusal to order the prosecution, pursuant to a defendant's discovery motion, to provide the criminal record of each expected witness for the state was not a violation of Brady and its progeny. Davis v. State, 554 So.2d at 1100."
Hardy v. State, 804 So.2d 247, 286 (Ala. Crim.App.1999), aff'd 804 So.2d 298 (Ala. 2000), cert. denied 534 U.S. 1043, 122 S.Ct. 621, 151 L.Ed.2d 543 (2001). See also Dorsey v. State, 881 So.2d 460 (Ala.Crim. App.2001), rev'd on other ground, 881 So.2d 533 (Ala.2003).
In the absence of any indication otherwise, we cannot hold that the trial court's denial of McGowan's requesta decision that was within the court's discretionwas improper. Moreover, the record before this court does not indicate any Brady or discovery violation under Ex parte Monk. See Minor v. State, 780 So.2d 707, 738-40 (Ala.Crim.App.1999), rev'd on other ground, 780 So.2d 796 (Ala.2000).

F.
McGowan contends that the trial court erred in denying his "Motion to Require Disclosure of Any and All Information Concerning Prospective Jurors Which May Be Favorable to the Defense," in which he asked for disclosure of "any reason why a juror would be particularly favorable or unfavorable to the defense, or why a particular juror should not serve." He further contends that the trial court erred in denying his "Motion to Disclose the Past and Present Relationships, Associations and Ties Between the Prosecuting Attorney [and Staff, the Sheriff and Staff, and the State and/or its Agents and Employees], and Prospective Jurors." In that motion, McGowan asked for production of "religious, social, business, professional, recreational, and political associations, and previous employment by or dealings with any prospective juror or juror's family as *967 to the criminal justice system." He asserts that, by those rulings, "the trial court denied [him] his rights to an impartial jury, and the exercise of peremptory strikes protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law." (McGowan's brief, p. 36.)
In Dorsey v. State, 881 So.2d 460, 484 (Ala.Crim.App.2001), aff'd in pertinent part, rev'd in part, 881 So.2d 533 (Ala. 2003), in affirming the trial court's denial of the defendant's motion seeking to have the State disclose favorable information about the prospective jurors, the court reiterated: "`The State has no duty to disclose information concerning prospective jurors.'" (Quoting McGriff v. State, 908 So.2d 961, 981 (Ala.Crim.App.2000).) Moreover, "`the state has no duty to disclose information that is available to the appellant from another source. Hurst v. State, 469 So.2d 720 (Ala.Cr.App.1985). Here, the appellant could have procured this information from the veniremembers themselves during voir dire.'" Arthur v. State, 711 So.2d 1031, 1080 (Ala.Crim.App. 1996) (quoting Kelley v. State, 602 So.2d 473, 478 (Ala.Crim.App.1992)), aff'd, 711 So.2d 1097 (Ala.1997). See also Williams v. State, 654 So.2d 74 (Ala.Crim.App.1994). Although the trial court denied McGowan's motions, it permitted the parties practically unlimited voir dire of the venirepersons.
Furthermore, in specific regard to the trial court's denial of McGowan's motion to disclose possibly favorable information, we adopt the approach taken by the court in Lee v. State, 683 So.2d 33, 38 (Ala.Crim.App.1996). In dismissing the appellant's contention that the trial court violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by denying his "Motion to Require Disclosure of Any and All Information Concerning Prospective Jurors Which May Be Favorable to the Defense," the court stated:
"In his brief to this court, Lee has not alleged that the prosecutor in fact withheld any information whatsoever which would be favorable to his defense. Further, nothing in the record indicates that the prosecutor withheld such information. We find no error in the trial court's denial of this motion."
683 So.2d at 38.
Finally, in specific regard to McGowan's request that the prosecution disclose any relationship between any potential juror and law enforcement, we find Travis v. State, 776 So.2d 819 (Ala.Crim. App.1997), aff'd, 776 So.2d 874 (Ala.2000), applicable. There, the court observed:
"[T]he appellant fails to name in brief any member of his venire whom he has subsequently learned had had a relationship with any member of the prosecution that might have caused such a person to have a natural bias in favor of the State. The appellant has failed to show in what manner he was prejudiced by the denial of his motion. See Ala. R.App. P., Rule 45. See also, DeFries v. State, 597 So.2d 742 (Ala.Cr.App.1992) (no error in denying motion to disclose past relationships where the same questions were allowed during voir dire at trial)."
776 So.2d at 870.
Accordingly, we find that the trial court properly denied McGowan's motions.

G.
McGowan contends that the trial court, by denying his motion for individually sequestered voir dire and by failing to conduct individually sequestered voir dire, violated his rights guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama *968 law. After each of four panels was examined outside the presence of the other panels, the trial court allowed sequestered questioning of any venireperson who expressed knowledge of the case.
"This Court has repeatedly upheld the denial of individual voir dire in capital cases." Tomlin v. State, 909 So.2d 213, 232 (Ala.Crim.App.2002).
"`"In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court." Coral v. State, 628 So.2d 954, 968 (Ala.Cr.App.1992). "The fact that the appellant's case involved capital murder is not alone reason to require individual voir dire. . . . A trial court's decision in denying individual voir dire examination of a jury panel will not be disturbed on appeal absent an abuse of that discretion." Smith v. State, 588 So.2d 561, 579 (Ala.Cr.App.1991). See also Henderson v. State, 583 So.2d 276, 283 (Ala.Cr.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).'"
Ferguson v. State, 814 So.2d 925, 937-38 (Ala.Crim.App.2000) (quoting Taylor v. State, 666 So.2d 36, 66 (Ala.Crim.App. 1994), aff'd, 666 So.2d 73 (Ala.1995)), aff'd 814 So.2d 970 (Ala.2001). See also Broadnax v. State, 825 So.2d 134, 161-62 (Ala. Crim.App.2000), aff'd 825 So.2d 233 (Ala. 2001).
Our review of the voir dire questioning indicates that the method of the examination and the precautions taken "provided reasonable assurance that prejudice would have been discovered if present." Haney v. State, 603 So.2d 368, 402 (Ala.Crim.App. 1991), aff'd 603 So.2d 412 (Ala.1992). Moreover, we note that McGowan does not allege any specific response by a venireperson during voir dire that may have "tainted" his or her panel. The voir dire questioning was detailed and, when necessary, individualized. Therefore, the trial court properly denied McGowan's motion.

H.
McGowan contends that the trial court erred in denying his motion for a change of venue. He argues that he was entitled to a change of venue based on extensive coverage of the offense by the media which, he contends, deprived him of a fair trial and reliable sentencing hearing by an impartial jury.
The voir dire of the veniremembers concerning their knowledge of the case and how they obtained it was extensive. A substantial number of the venire remembered reading or hearing about the case, but most of those did not remember any facts, and all who were asked stated that what they had read or heard would not affect their ability to render a fair and impartial verdict based on the evidence and law presented in court. McGowan cites no evidence of prejudicial impact on prospective jurors. It' is noteworthy that the jury that tried the case recommended a sentence of life imprisonment without parole.
"`The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors.' Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). `A defendant is entitled to a change of venue if he can demonstrate to the trial court that he cannot receive a fair and impartial trial in the county where he is to be tried.' § 15-2-20, Ala.Code 1975; Nelson v. State, 440 So.2d 1130, 1131 (Ala.Cr.App.1983).

*969 "`"`There are two situations in which a change of venue is mandated. The first is when the defendant can show that prejudicial pretrial publicity "has so saturated the community as to have a probable impact on the prospective jurors" and thus renders the trial setting "inherently suspect." McWilliams v. United States, 394 F.2d 41 (8th Cir.1968); Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In this situation, a "pattern of deep and bitter prejudice" must exist in the community. Irvin v. Dowd, 366 U.S. at 727, 81 S.Ct. 1639.'"
"`"`The second situation occurs when the defendant shows "a connection between the publicity generated by the news articles, radio and television broadcasts and the existence of actual jury prejudice." McWilliams v. United States, supra.'"'
"Hyde v. State, 778 So.2d 199, 231 (Ala. Cr.App.1998), quoting Holladay v. State, 549 So.2d 122, 125-26 (Ala.Cr.App. 1988)."
Burgess v. State, 827 So.2d 134, 159 (Ala. Crim.App.1999), aff'd, 827 So.2d 193 (Ala. 2000).
McGowan has failed to show that the community was so saturated with prejudicial pretrial publicity that he was denied a fair and impartial trial; nor did he show the existence of any actual jury prejudice. The trial court did not abuse its discretion in denying McGowan's motion for a change of venue.

I.
McGowan contends that the trial court's denying his motion to invoke "the rule" to exclude the victims' daughter from the courtroom and allowing her, over his objection, to sit at the State's counsel table throughout the trial "violated [his] right to a jury decision based on the evidence and legitimate considerations, and his rights to due process, a fair trial, an impartial jury, and a reliable sentencing, protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law." (McGowan's brief, pp. 40-41.) In arguing that her presence rendered the guilt phase fundamentally unfair and the penalty phase arbitrary and capricious, he cites Fuselier v. State, 468 So.2d 45, 53 (Miss.1985), in which the Mississippi court noted that the victim's daughter's "presence at counsel table and open display of emotion presented the jury with the image of a prosecution acting on [her] behalf"  "an erroneous view [that] can all too easily lead to a verdict based on vengeance and sympathy as opposed to reasonable application of rules of law to the facts." (Footnote omitted.) He further contends that "[i]t was simply not possible for the jury to critically examine the weight of [her] testimony" and that her sitting at counsel's table "gave [her] a special role in the proceedings and graced her with the state's imprimatur." (McGowan's brief, p. 40.)
However, McGowan also recognizes that Alabama law creates a right for a relative of a capital-murder victim to sit at the State's table even though that relative would be a witness for the State. See §§ 15-14-56(a) ("Whenever a victim is unable to attend such trial . . . by reason of death . . . the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of [The Alabama Crime Victims' Court Attendance Act]."); 15-14-53 ("The victim of a criminal offense shall be entitled to be present in any court exercising any jurisdiction over such offense and therein to be seated at the counsel table of [the] prosecutor. *970 . . ."); 15-14-55 ("A victim of a criminal offense shall be exempt from the operation of rule of court, regulation, or statute or other law requiring the separation or exclusion of witnesses from court in criminal trials or hearings."); 15-14-51(b) ("[T]he Legislature hereby finds and determines that it is essential to the fair and impartial administration of justice that a victim of a criminal offense not be excluded from any . . . trial . . . merely because the victim has been . . . subpoenaed to testify at . . . trial."). See also Rule 615, Ala. R. Evid., which states:
"At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of . . . a victim of a criminal offense or the representative of a victim who is unable to attend. . . ."
See, e.g., Whitehead v. State, 777 So.2d 781, 803 (Ala.Crim.App.1999) (rejecting the argument that "the presence of [the victim's] family members`'gave them a special role in the proceedings and graced them with the state's imprimatur' and, therefore,. . . prevented the jury from `critically examining] the weight of their testimony'") (footnote omitted), p. 56, aff'd, 777 So.2d 854 (Ala.2000); Burgess v. State, 827 So.2d 134 (Ala.Crim.App.1998) (the capital-murder victim's husband was properly exempted from "the rule" and allowed to sit at counsel table), aff'd, 827 So.2d 193 (Ala. 2000); Johnson v. State, 648 So.2d 629, 634 (Ala.Crim.App.1994) ("the deceased's granddaughter was properly allowed to remain at counsel table, although she was also a witness, because she was representing the family and the victim").
The following is apropos here: "Other than his vague, unsupported assertion that he was `prejudiced,' [McGowan] has offered no argument to demonstrate how he was prejudiced as a result of the presence of the [victims' daughter] during his trial." Whitehead, 777 So.2d at 803. McGowan has pointed to no indication that this witness was overly emotional or disruptive during any of the proceedings. We further note that the jury recommended the lesser of the two possible punishments: life imprisonment without the possibility of parole. Moreover, the statutory creation of the right of the victim's representative to be excluded from operation of "the rule" is constitutional. Henderson v. State, 583 So.2d 276, 286 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991). We find no abuse of discretion by the trial court in denying McGowan's pretrial motion and overruling his objection at trial regarding the presence of the victims's daughter at counsel table.

VII.
McGowan contends that the prosecutor engaged in misconduct that, he argues, denied him a fair trial, due process, and a reliable sentence.

A.
McGowan first contends that the prosecutor "made a mockery of [his] right to counsel by attacking his attorneys." (McGowan's brief, p. 41.) He refers only to the following remark made by the prosecutor during a bench conference about defense counsel's attempt to introduce evidence that the trial court had ruled inadmissible in an evidentiary hearing: "We object to this garbage." Defense counsel did not object to this remark. Thus, we review it under the plain-error standard.
We do not agree with McGowan's interpretation that this comment was an attack on defense counsel. Instead, we find that the word "garbage" was directed at the argument advanced by defense counsel and at the fact that counsel was pursuing *971 this argument even though the trial court had already rejected it in an evidentiary hearing. See Crook v. State, 276 Ala. 268, 269, 270, 160 So.2d 896, 896, 897 (1962) (the use of the word "disgusting," in the prosecutor's argument to the jury that it should not listen to a "`disgusting theory that springs out from the minds of the imaginative lawyers,'" "was not directed at counsel, but at the theories advanced by counsel" and, thus, the trial court's overruling the defendant's objections to the comment was not reversible error). "One of the most prevalent arguments to a jury is that the position and argument of the adversary is unwarranted, silly, fanciful or illogical." 276 Ala. at 270, 160 So.2d at 897. We reject McGowan's argument that the jury construed this isolated comment as an implication or charge against defense counsel. We find no error. See also West v. State, 793 So.2d 870, 882-85 (Ala.Crim. App.2000), and cases cited therein.

B.
McGowan asserts that the following emphasized comment by the prosecutor, in his guilt-phase closing argument, was improper because, McGowan argues, it was the prosecutor's expression of his personal opinion that McGowan was guilty:
"You cannot get around what the evidence says in this testimony. You've heard it. You know what makes sense and what doesn't. . . .
"And I submit to you that you know what happened out there. You know it in your heart, as well as I do. You know who went in there and who had that hammer. You know who beat Mr. Hiram Johnson in the head. You know who beat Ms. Mamie Johnson in the head.
"And I submit to you that when you go back there and consider all the evidence in this case, that you are going to convict him of capital murder, `cause you are going to follow the instructions and the law that the Judge is going to give you. . . ."
(Emphasis added.) Because this issue was not presented to the trial court, we review it for plain error.
"`"[T]he rule on which the weight of authority' is in agreement is that it is improper for the prosecuting attorney. . . to express his personal opinion or belief in guilt of accused [so] as to permit an inference by the jury that such opinion or belief is based on reasons or information outside the evidence, but that it is not improper for him to argue or to express his opinion that accused is guilty, where he states, or it is apparent, that such opinion is based solely on the evidence." 23A C.J.S. Criminal Law § 1104, p. 194-95 (1961). See Crenshaw v. State, 153 Ala. 5, 7, 45 So. 631, 632 (1908) (prosecutor argued to the effect that the evidence showed a clear case); Cranmore v. State, 41 Ala.App. 276, 279, 129 So.2d 121, 123 (1961) (prosecutor's statement, "I never did ask you to convict a man I believe to be innocent" found to be "a mere expression of opinion by the solicitor that the defendant was guilty, and . . . not a cause for reversal"); Handley v. State, 214 Ala. 172, 175, 106 So. 692, 695 (1925) (argument, "She is a murderer; she is a murderer. She is not some one who has committed some of the lower offenses of homicide" did "not transcend the bounds of legitimate argument"); Gardner v. State, 17 Ala.App. 589, 590-91, 87 So. 885, 886, cert. denied, 205 Ala. 60, 87 So. 888 (1920) (prosecutor's argument that the defendant "is a pickpocket" in prosecution for grand larceny "was the expression of an opinion" by the *972 prosecutor, "and from the state's contention was supported by one phase of the evidence." Presiding Judge Bricken dissented, arguing that "it did not lie in the mouth of the solicitor to decide these vital questions."); McColston v. State, 20 Ala.App. 591, 593, 104 So. 347, 348-49 (1925) (prosecutor's argument, "He is guilty of the crime of highway robbery," should be refrained from but did not constitute error); Dunn v. State, 19 Ala.App. 576, 577, 99 So. 154, 155 (1924) (prosecutor's comment, "I tell you that this defendant is guilty," was merely an argument of the inference drawn by the solicitor and was not improper); Griggs v. State, 21 Ala.App. 530, 531, 109 So. 611 (1926) (prosecutor stated that from the evidence he believed the defendant was guilty, and that, if he did not believe the defendant was guilty, he would not ask the jury to convict him. Held: The opinion was based upon the evidence. "Where this is the case, such expression of opinion will not be sufficient upon which to predicate a reversal."); Tucker v. State, 28 Ala.App. 492, 494, 188 So. 276, 277 (1939) (prosecutor's statement, "I believe he [defendant] is guilty" was a "mere expression of opinion by the solicitor" and not improper remark); Gilbert v. State, 19 Ala.App. 104, 106-07, 95 So. 502, 504 (1923) (prosecutor's closing argument, "He is guilty as hell itself under this testimony, and you know it" though not approved was "but the mere expression of counsel made in argument").'
"Galloway v. State, 484 So.2d 1199, 1201 (Ala.Cr.App.1986)."
Hunt v. State, 659 So.2d 933, 940-42 (Ala. Crim.App.1994) (holding that the following comments by the prosecutor were not error: that he felt that the evidence presented was "`overwhelming,'" that "`at the conclusion of this trial ... you will agree with the State of Alabama that the defendant is guilty of capital murder,'" and that "`if this isn't capital murder, then there has never been capital murder in Walker County'"), aff'd, 659 So.2d 960 (Ala.1995).
It is apparent from the above excerpt of the prosecutor's closing argument that his confidence in McGowan's guilt was based solely on the evidence. He was merely commenting on the strength of the evidence, and he was not improperly encouraging the jury to convict "`based on reasons or information outside the evidence.'" Galloway v. State, 484 So.2d 1199, 1201 (Ala.Crim.App.1986) (quoting 23A C.J.S. Criminal Law § 1104 (1961)). Contrary to McGowan's argument, there is no implication in the prosecutor's remark that the prosecutor had reasons not known by the jury, i.e., not arising from the evidence, for believing that McGowan was guilty of capital murder.
Moreover, we note that the prosecutor subsequently told the jurors that they were the sole judges of the facts, as follows: "[L]ook at the evidence. What these lawyers say is not evidence in this case. The evidence will come from the witness stand. That's what you've got to look at. . . . Not what I say and what they say. The evidence." Furthermore, the trial court instructed the jury at the beginning of the trial, as follows:
"Now, an attorney is an officer of the Court. It is his duty to make such objections to proceedings proper, to fully argue the client's cause and attorney's statements and arguments are to help you understand the evidence and you should disregard any remarks, statements, or arguments which are not supported by the evidence or the law given to you in charge by the Court.

*973 ". . . [E]ach side is going to tell you what they think the evidence is going to be and in closing statements, they are going to tell you what they thought the evidence was.
"You should only accept or reject those theories or contentions based on what you view the evidence and how you feel like that part helped you understand the evidence. That argument will not be evidence."
In addition, the trial court properly instructed the jurors, during closing argument, "I'll order the jury to determine what's in evidence and what is not in evidence." The trial court instructed in its jury charge, "[A]ll questions of fact are to be determined by you."
"Furthermore, even if the comment were construed to be an impermissible expression of the prosecutor's personal opinion regarding the appellant's guilt, the comment in this case would not warrant reversal. `"[Statements of counsel in argument to the jury must be viewed as having been made in the heat of the debate, and such statements are usually valued by the jury at their true worth."' Stephens v. State, 580 So.2d 11, 22 (Ala. Cr.App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991), quoting Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr. App.1988)."
Hagood v. State, 777 So.2d 162, 207 (Ala. Crim.App.1998) (reviewing the prosecutor's comment, "`Just like the defense believes strongly in their case, I believe strongly in this one.'" 777 So.2d at 205), aff'd as to conviction, rev'd as to sentence, 777 So.2d 214 (Ala.1999).

C.
McGowan contends that the prosecutor committed reversible error by commenting on punishment during the guilt-phase closing argument. The prosecutor concluded his initial closing argument with the following remarks:
"[McGowan is] the one that wielded the hammer and he's the one that ought to be punished for it.

"I submit to you that the only way that he can be punished in this case, appropriate to the crime he committed is that you . . . return a verdict of guilty of capital murder. Not a verdict of guilty of murder or felony murder or manslaughter, capital murder. And I think that if you remember the evidence and you follow your oath . . . and you follow [the trial court's] instructions, that will be your only verdict that you can come back with."
(Emphasis added.)
Because this issue was not presented to the trial court, we review it for plain error only. Rule 45A, Ala. R.Crim. P. "In judging a prosecutor's closing argument, the standard is whether the argument 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead v. State, 585 So.2d 97, 107 (Ala.Crim.App.1989) (quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). "`[T]he failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd 577 So.2d 531 (Ala.1991) (quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985)). We must evaluate the comment and its impact in the context of the entire trial, not in the abstract. Burgess v. State, 811 So.2d 557, 594 (Ala.Crim.App. 1998), aff'd in pertinent part, rev'd on other ground 811 So.2d 617 (Ala.2000). It *974 must also be viewed as having been made in the heat of the debate, and such a remark is usually valued by the jury at its true worth and not expected to become a factor in the formulation of the verdict. Hall v. State, 820 So.2d 113 (Ala.Crim.App. 1999), aff'd, 820 So.2d 152 (Ala.2001); Bankhead v. State.
In Stallworth v. State, 868 So.2d 1128, 1157 (Ala.Crim.App.2001), the appellant contended that the prosecutor improperly commented on punishment during his guilt-phase closing argument, when he stated:
"`And I believe that if you fairly and honestly and reasonably with good common sense assess the overwhelming evidence which the State of Alabama has presented to you, and you do it consistent with the law as Judge Reid will hand you, that you will find that Calvin Stallworth, with the intent to commit a murder, in a mean and despicable and in cowardly acts, went into two different convenience stores in Baldwin County on December 4 and December 16, 1997, and there and then wielded a knife or other sharp instrument against the bodies of two helpless, unarmed women, and there and then stabbed them with sufficient force and sufficient direction and sufficient intensity to end their lives. For money. And for that, he should face Alabama's electric chair.'"
In finding that the comment was not improper, the court stated:
"We stated in McGriff v. State, 908 So.2d 961 (Ala.Crim.App.2000):
"`"Punishment is `an improper consideration at the guilt phase of [a capital] trial.' Berard v. State, 486 So.2d 476, 479 (Ala.1985)[, on remand, 486 So.2d 482 (Ala.Crim.App.1986)]." McNair v. State, 653 So.2d 320, 338 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159 (1995).'
"After reading the entire argument, we conclude that the remark was not that Stallworth should be sentenced to death but that he should be convicted of capital murder so that he would have to face the death penalty at the penalty phase. There was no improper argument here."
868 So.2d at 1157.
We find that the prosecutor's comment in this case did not rise to the level of plain error. Although the comment was probably inappropriate and irrelevant, it did not, when viewed in context, undermine the fundamental fairness of the trial. The trial court's instructions were clearthe jury could not find McGowan guilty of capital murder until it found that the evidence established beyond a reasonable doubt each element of the capital offense. The jury could not have reasonably interpreted the isolated comment to mean that the State was relieved of its burden to prove each element beyond a reasonable doubt. Rather, it was stated in the context of the obvious strength of the State's case for capital murder. We find that the comment did not diminish or detract from the jury's responsibility and role in the guilt phase.
Moreover, given the overwhelming evidence of McGowan's guilt, the jury would have returned a verdict of guilt even if the prosecutor had not made the comment. "Following the standard of Darden v. Wainwright, we conclude that `the overwhelming. . . evidence to support a finding of guilt . . . [not only] reduced [but virtually eliminated] the likelihood that the jury's decision was influenced by argument.'" McNair v. State, 653 So.2d 320, 332 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) (quoting Darden v. Wainwright, 477 U.S. at 182, 106 S.Ct. 2464). *975 There is no reasonable likelihood that, in the absence of the remark, the jury would have acquitted McGowan or convicted him of a lesser-included offense. Moreover, we note that the jury returned a recommendation of life imprisonment without the possibility of parole instead of the death penalty. We think this is indicative of the jury's ability to weigh the evidence without prejudice.
Finally, we find that the two cases relied on by McGowanBerard v. State, 486 So.2d 476 (Ala.1985), and Ex parte Smith, 581 So.2d 531 (Ala.1991)are distinguishable. The judgments in both cases were reversed because the issue of the defendant's future dangerousness was raised during the guilt phase. In Berard over objection, the defendant's psychiatrist answered affirmatively the question, on cross-examination, whether the defendant could lapse into a psychotic spell in the future and kill again.[6] In Smith, the prosecutor argued, "`[I]f this defendant ever gets loose again, he's going . . . to kill again. And I would ask you to consider that, because. . . . only you can stop him for sure.'" 581 So.2d at 532.
Based on the foregoing, we find no plain error here.

D.
McGowan contends that the following remarks by the prosecutor at the conclusion of his rebuttal closing argument were reversible error: "You've only got one verdict to make in this case, anything less . . . is a violation of your oath. Any other verdict other than capital murder. . . ." McGowan did not object to these comments; therefore, we review this claim pursuant to the plain-error rule.
Because we review these comments in the context of the entire trial, we note that the prosecutor began his initial closing argument with the following remarks:
"[W]hen you took an oath . . ., you took an oath to follow the . . . [trial court's] instructions. I ask . . . in the beginning of the deliberations, if you would remember that oath that you took, as you remember the instructions that the Judge has given you. And that you remember the evidence that you've heard in this case."
The prosecutor concluded his initial closing argument with the following remarks: "I think that if you remember the evidence and you follow your oath . . . and you follow [the trial court's] instructions, [a verdict of guilty of capital murder] will be your only verdict that you can come back with." Moreover, the trial court instructed the jury numerous times that it was to arrive at its verdicts by "full and fair consideration of all the evidence." In opening, the court, after explaining that the attorney's argument was not evidence, stated the following:
"[Witnesses will be called to testify. All witnesses will be sworn and will testify under oath. Their testimony will be evidence. There may be exhibits offered, which if received by the Court, will also be evidence. Upon all this evidence that you will use to arrive at your final verdict.
". . . It will be you duty as jurors, to follow this law given to you in charge by the Court. You, therefore, render a verdict in accordance to the law that I give you in charge from the facts that you find from the evidence because the facts are your determination and your sole determination.
"Now, you are the sole exclusive judges of the facts. . . ."
*976 In Melson v. State, 775 So.2d 857 (Ala. Crim.App.1999), aff'd, 775 So.2d 904 (Ala. 2000), the court reviewed the following comment by the prosecutor for plain error:
"`When you have returned those [guilty] verdicts, you will have done your duty and you will have kept your oath to Almighty God when you raised your hand and said that you would a true and fair verdict render according to the evidence, and when you have done that, nobody has a right to complain.'"
775 So.2d at 890. In finding that "nothing in the prosecutor's argument . . . exceeded the bounds of proper comment," id., the court stated:
"As we have stated, `[generally, the prosecutor is in error by exhorting the jury to "do what's right," or to "do its job," if that exhortation "impl[ies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law. See United States v. Young, 470 U.S. [1] at 18, 105 S.Ct. [1038] at 1047[, 84 L.Ed.2d 1 (1985)]." Arthur v. State, 575 So.2d 1165, 1185 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991).' McNair v. State, 653 So.2d 320, 339-40 (Ala.Cr.App.1992), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995).
"However, we do not find that the prosecutor in this case was making any such exhortation for the jury to return guilty verdicts regardless of the evidence presented at trial. In fact, the prosecutor stated in his argument that a true and fair verdict must be rendered according to the evidence. Moreover, the trial court properly instructed the jury that its verdicts must be based on the evidence presented at trial and in accordance with the law as it was charged by the trial court. . . .
"In Taylor v. State, [666 So.2d 36 (Ala.Crim.App.), rem'd. on other grounds, opinion extended and aff'd on return to remand, 666 So.2d 71 (Ala.Cr. App.1994), aff'd, 666 So.2d 73 (Ala. 1995)], we held:
"`The appellant objects for the first time on appeal to the argument of the district attorney urging the jury to "do our duty" and find the appellant guilty, and for the jury to "do the right thing" and recommend death for the appellant. . . . We find no plain error in these remarks. "In a very real sense, a jury does have a `duty' to convict the accused of the offense charged in the indictment if it finds the accused guilty of that offense beyond a reasonable doubt." Kuenzel v. State, 577 So.2d 474, 517 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).'
"666 So.2d at 65. Here, the prosecutor was merely arguing to the jury that the evidence was sufficient to prove beyond a reasonable doubt that Melson was guilty and that, therefore, the jury should return guilty verdicts on all counts of the indictment. It is not improper for the prosecutor to express his opinion that the accused is guilty, so long as it is apparent that such opinion is based solely on the evidence. Price v. State, 725 So.2d 1003 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998). The prosecutor was not, as Melson alleges on appeal, arguing to the jurors that only guilty verdicts would allow them to honor their oaths to God.
"In rejecting a claim that the admission of victim impact evidence during the guilt phase of the trial was not plain error, the Alabama Supreme Court stated the following in Ex parte Rieber, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. *977 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995):
"`It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected that Ms. Craig [the murder victim] was not a "human island," but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991)).'
"663 So.2d at 1006.
"While directed to a different claim of error, the reasoning in Ex parte Rieber is applicable to Melson's claim in the present case: it should come as no surprise to jurors serving on a jury in a capital murder trial that the prosecution is seeking a conviction, and that the prosecution is confident that its evidence will prove the defendant's guilt beyond a reasonable doubt. The prosecutor's comments were not, as Melson urges, an expression of his personal opinion as to Melson's guilt. They were, instead, merely the prosecutor's impression of the evidence. Thus, for the reasons stated above, we find no plain error as to this claim."
775 So.2d at 890-891. See also Dowdy v. State, 19 Ala.App. 503, 504, 98 So. 365, 366 (in finding no error in the prosecutor's comments "`If you do . . . what your oaths required you to do, you will convict the defendant under the testimony.'"the court reasoned, "Counsel may argue every inference arising out of the evidence. A conviction is asked under the evidence, and the solicitor did not transcend legitimate bounds of argument."), rev'd on other ground, 210 Ala. 419, 98 So. 367 (1923).
Based on the foregoing, we find that the prosecutor did not commit plain error by his final remarks about the jury's oath. He did not, "in exhorting the jury to [honor its oath] . . . imply that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law." Arthur v. State, 575 So.2d 1165, 1185 (Ala.Crim.App.1990) (emphasis added). "Our review of the entire record and of the context in which these remarks were made convinces us that the prosecutor was merely urging the jury to return a verdict based on the facts under the applicable law as they had sworn to do." Morrison v. State, 551 So.2d 435, 440 (Ala.Crim.App. 1989) (on four occasions, the prosecutor reminded the jurors of their oath in asking the jury to recommend the death penalty).

E.
McGowan contends that, with the following comments in his guilt-phase opening argument, the prosecutor misstated the law regarding reasonable doubt:
"The Judge will describe . . . some legal terms, to you later on in the trial. Reasonable doubt. He will tell you that reasonable doubt is not a doubt for which there is an impossible doubt or doubt for which you go outside the evidence. He will tell you it is a doubt for which you must have a reason from the evidence."
(Emphasis added.) McGowan argues, without any citation of authority, that this comment was contrary to Alabama law that holds that reasonable doubt may come from the evidence or from a lack of evidence and that it shifted the burden of proof to McGowan. No objection was entered *978 as to this statement. Therefore, we review it for plain error.
We disagree with McGowan's assertion that, by his comments, the prosecutor told the jury that reasonable doubt may not come from a lack of evidence. We find the following discussion, in Egantoff v. State, 208 So.2d 843 (Fla.Dist.Ct.App.1968), apropos, although it addresses the question whether the trial court instructions, taken as a whole, charged the jury that a reasonable doubt could arise from a lack of evidence:
"We think counsel has misconstrued the purport, as well as the intendment, of the Judge's charge. It is true that at one point in his instructions the Judge stated: `the jury has no right whatever to go outside of the testimony for doubts of any kind.' But what the Judge meant, and we are sure the jury understood, was that they could not go outside ' the evidence at the trial to look for 'affirmative facts' upon which to base a reasonable doubt. This is not at all the same as a reasonable doubt which they might entertain after listening to all the evidence submitted to them. And the reasonable doubt thus entertained might just as logically be from a `lack of evidence' as from one or more aspects of the evidence itself. . The Judge seemingly made this clear to the jury when he charged that `if after having heard and carefully considered all of the evidence. . . you have a reasonable doubt in your mind as to the defendant's guilt . . . then you must acquit him.' This did not mean that the jury would necessarily have to disbelieve all or some of the testimony in order to acquit. They could believe all of it and still have a reasonable doubt. In such event, the reasonable doubt would have of necessity arisen from `lack of evidence'. So the jury was, in effect, charged that a reasonable doubt could arise from a lack of evidence."
208 So.2d at 845.
We also find the following discussion in Hoskins v. State, 441 N.E.2d 419 (Ind. 1982), to apply here:
"A doubt cannot arise from some fact or circumstance outside the evidence or something in the juror's mind that is not based upon an impartial consideration of all the evidence and circumstances.
". . . Any consideration and determination of the jury is to be made on the evidence presented to them. Imagination or speculation is not a proper basis for presenting evidence nor for analyzing it or reaching conclusions based on it. In fact, the purpose of our rules of evidence and the procedures we follow in conducting a trial is to remove imagination and speculation from the process and to determine the best we humanly can that an individual is guilty or not guilty based on sound probative evidence."
441 N.E.2d at 426.
In addition to instructing the jury that the State had the burden of proving each element beyond a reasonable doubt, the court correctly instructed the jury, as follows:
"You are not to speculate where there is no evidence. . . .
". . . .
". . . The burden [of proof] never rests upon the defendant to establish his innocence, nor to disprove the facts tending to establish his guilt. . . . [T]he defendant is presumed to be innocent, and the presumption that he is innocent, remains throughout the course of the trial until each and every juror is convinced from the evidence that the defendant is guilty beyond a reasonable doubt. This presumption of innocence is to be regarded *979 by you as a matter of evidence and it's a benefit to which the defendant is entitled. And only until and unless you are convinced from the evidence that the defendant is guilty beyond a reasonable doubt, only at that time does the presumption that he is innocent leave him.
". . . .
"The phrase, `reasonable doubt,' is self explanatory. Efforts to define it do not always clarify the term but it may help to note, that it is so not a mere possible doubt. Everything relating to human affairs is open to some possible or imaginary doubt. A reasonable doubt is a doubt of a fair minded juror honestly seeking the truth after careful and impartial consideration of all evidence in the case. This based upon reason and common sense is a doubt for which a rational explanation and a reason for having it can be given. It does not mean a vague or arbitrary notion, but is an actual doubt, based upon the evidence or part of the evidence, the lack of evidence, a conflict in the evidence or some combination thereof. It's the doubt that remains after going over in your minds the entire case and giving consideration to all the testimony. It would be distinguished and is different from mere possibility, bare imagination or fanciful conjecture.
". . . .
". . . [S]ome of the evidence offered by the State to prove the guilt of the defendant. . . is circumstantial, and before you would be authorized to convict the defendant, the evidence must be so strong as to exclude every reasonable hypothesis except that of guilt. . . ."
We note that, before any testimony was presented, the trial court told the jury that one of the court's duties was to give the jury the law at the end of the testimony and it would be the jurors' duty to follow that law in rendering a verdict. The court also stated, "[Y]ou should disregard any remarks, statements, or arguments which are not supported by the evidence or the law given to you in charge by the Court." At the beginning of its oral charge, the trial court stated, "[I]t's my duty to make a plain statement of the law, applicable to the case. It will be your duty to follow the law given you in charge by the Court."
When viewing the prosecutor's comment in light of the trial court's jury instructions, we find no error, much less plain error. See Ex parte Taylor, 666 So.2d 73, 84 (Ala.1995) (in reviewing for plain error the trial court's instructions on reasonable doubt, which included the statement that "`the law . . . prohibits you from going outside the evidence to hunt up doubts upon which to acquit,'" the Court held that they properly defined reasonable doubt). See also Ben-Yisrayl v. State, 729 N.E.2d 102, 111 (Ind.2000); State v. Ziglar, 308 N.C. 747, 752, 753, 304 S.E.2d 206, 211 (1983) (in response to the appellant's argument that the instruction "`neither should you go outside the evidence to imagine doubt to justify an acquittal'" negated the proposition that an acquittal is appropriate if there is an insufficiency of the evidence, the court stated that, even if it might be erroneous in isolation, the trial court "in clear and concise terms" instructed that a reasonable doubt may be based on an insufficiency of the evidence). The jury was correctly instructed that a reasonable doubt could be based on a lack of evidence. While the prosecutor's comment could have stated the true rule more clearly, we find that the prosecutor's comment did not shift the burden of proof to McGowan. Cf. United States v. Hart, 640 F.2d 856, 859-60 (6th Cir.1981).

F.
McGowan asserts that the cumulative effect of the prosecutor's alleged misconduct *980 rendered his trial unreliable and violated his rights to due process, a fair trial, and an impartial jury. The Alabama Supreme Court, in Ex parte Tomlin, 540 So.2d 668 (Ala.1988), has held that the cumulative effect of prosecutorial misconduct may warrant reversal when the individual errors alone would not. We have reviewed the cumulative effect of the alleged misconduct here and find that it does not warrant reversal.

VIII.
McGowan contends that the trial court erred when it denied his challenge for cause of veniremember T.K. and when it failed to sua sponte remove veniremember T.G. He argues that neither veniremember could serve impartially on his jury.
During the general voir dire examination T.K. revealed that she was related to two possible witnesses in the case. An individual voir dire was then conducted. The record shows the following:
"Mr. Hines [defense counsel]:. . . . [C]an you tell us how you heard about [this case]?
"[T.K.]: Well, from the newspapers first and then from Ronnie Harper.
"Mr. Hines:. . . . The Ronnie Harper that's going to be a witness in this case?
"[T.K.]: That's what he told me.
"Mr. Hines: He told you that he was going to be a witness.
"[T.K.]: Yes.
"Mr. Hines: What did Ronnie tell you that he would be expected to testify to?
"[T.K.]: He didn't. I mean, we don't socialize orI don't really know him that well, to be honest with you. That was just a comment that he made at my sister's house, that he was a witness in the case.
"Mr. Hines: And what was he doing over at your sister's house?
"[T.K.]: He was looking for his father, my Uncle.
"Mr. Hines: Okay. And, but y'all are close enough where y'all would talk about matters such as this, about his going to testify, did he know that you were going to be a juror at that time?
"[T.K.]: No. This had been right after it happened, maybe a few months. I don't even really know. It's been over a year though. . . .
"Mr. Hines:. . . . [Y]ou are also the first cousin of Lois Myers?
"[T.K.]: Right. And I haven't seen her in a couple of years. . . . [T]hey are my cousins, but we're not close. We don't socialize. We don't talk on the phone. We don't
"Mr. Hines: You don't like them?
"[T.K.]: Basically, no, I don't.
"Mr. Hines: Could you believe what they would say under oath?
"[T.K.]: Yes, I would hope they would. . . tell the truth, yes.
"Mr. Hines: Well, the fact that you are kin to them, what we are looking for is a juror that is totally disinterested in the case.
"[T.K.]: Right. I understand.
"Mr. Hines: And you don't have any preconceived ideas
"[T.K.]: Right.
"Mr. Hines:and not talked to witnesses, and . . . brought some things from outside in?
"[T.K.]: Right.
"Mr. Hines: And you have done that or you know about this case.
"[T.K.]: I know that it happened from the newspapers. And I know that he was going to be a witness. I didn't know that she was going to be a witness.

*981 "Mr. Hines: Knowing all that and knowing about what you have heard and knowing that you are kin to these people, will run into them from time to time, do you feel that you can be a hundred percent neutral and disinterested in this case?
"[T.K.]: I do, because I don't know their position in this case.... I mean I don't know whereare they testifying for the defense or theI don't know.
"Mr. Hines: Now, do you have relatives that are members of the police force?
"[T.K.]: My mother worked for the chief as his assistant, but she is not an officer.
"Mr. Hines: And have you and your mother discussed this case?
"[T.K.]: No.
"Mr. Hines: Would the fact that your mother is involved in law enforcement kind of give you a reason to kind of fall off the fence that way toward the prosecution?
"[T.K.]: No.
"Mr. Hines: Would it do the opposite, would you favor the defendant?
"[T.K.]: No.
"Mr. Hines: Have you ever known anybody accused of a crime and be wrongly accused of the crime?
"[T.K.]: I read the book, Circumstantial Evidence.

"Mr. Hines: That's all.
Mr. Chapman [district attorney]: ... [D]o you know if Lois [Myers] ... made any mention of her relationship with any men?
"[T.K.]: I know about certainly about Rath Myers.
"....
"Mr. Chapman: Did you know that she had a relationship with the defendant?
"[T.K.]: Not until after [the crime].
"Mr. Chapman: How did you find out?
"[T.K.]: My father mentioned it.
"Mr. Chapman: What did he say?
"[T.K.]: He said that he thought they were engaged.
"Mr. Chapman: Are you saying that you could be a juror who would listen to the evidence in this case, make your decision on the facts as they came out of the court and the law as charged by the judge, solely on that, and put aside all these other connections that you know about this case?
"[T.K.]: I can't. I don't want to.
"Mr. Chapman: Tell us why you don't want to.
"[T.K.]: I just don't. Who does?
"Mr. Chapman: Does the fact that you have a connection with some of the people involved, have any bearing if you are selected as a juror?
"[T.K.]: I guess it would somewhat. Yes."
McGowan argues that the trial court should have granted his challenge for cause of T.K. because she was related to several witnesses and because she stated on voir dire that she could not be impartial. A review of her testimony on voir dire reveals that she did not have a close relationship with her relatives who were potential witnesses, that she did not know whether they were witnesses for the State or the defense, and that she was disinterested in the case and could be neutral. We tend to agree with the State's argument that it appears from the record that T.K. could be a fair and impartial juror, but she simply did not wish to sit on the case. However, her response to the question of whether her connections with some of the people involved in the case would have any bearing if she were selected as a juror"I guess it would somewhat. Yes."is troubling. It would have been better if the parties had pursued this line *982 of questioning further to determine precisely what she meant. The evidence of the voir dire examination falls short of proving an absolute bias that would have prevented T.K. from rendering a fair and impartial verdict had she been selected to serve on the jury. Under the circumstances here, we find that the trial court did not abuse its discretion in denying this challenge for cause.
Assuming, for the sake of argument that the trial court's ruling denying the challenge for cause of T.K. was erroneous, it would not constitute reversible error under the circumstances here. The improper removal of a prospective juror for cause is subject to a harmless-error analysis. See Evans v. State, 794 So.2d 411 (Ala.2000); Rule 45A, Ala. R.App. P. A defendant's right to an impartial jury is not violated when a trial court erroneously fails to grant a strike for cause of a juror who is ultimately removed from the venire by use of a peremptory strike. United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000); Evans v. State; Ray v. State, 809 So.2d 875 (Ala.Crim.App. 2001). Here, McGowan exercised one of his peremptory strikes to remove T.K. A defendant is entitled only to an impartial jury, and unless the defendant can show that a trial court's erroneous ruling during jury selection prevented the jury from being impartial, there is no violation of the constitutional right to an impartial jury. Evans v. State. McGowan has made no showing that his right to an impartial jury was probably injuriously affected by the trial court's refusal to excuse T.K. We conclude that, if the refusal to excuse T.K. was error, it was not reversible error, because, even with the error, McGowan had a fair trial with an impartial jury.
In reference to McGowan's contention that the trial court erred in failing to sua sponte remove veniremember T.G., the record of the voir dire examination shows the following:
"[T.G.]: My opinion on this, is that I don't know care what the age limit is, if you do wrong, you're wrong. The only time I am against the death penalty, is if you are in a mental state of mind. That's the only time I am against the death penalty.
"The Court: Well, you remember that I read out some statutory mitigating circumstances and, of course, it's up to each individual juror what mitigating circumstances they find to have existed and that goes in to what they believe.
"[T.G.]: Right.
"The Court: And that's a lot different that when we have aggravating circumstances, whereas aggravating circumstances have to be proved beyond a reasonable doubt to all 12 jurors. Whereas just mitigating circumstances is where the juror decides what affects their decision and then vote as to whether or not they believe the aggravating circumstance outweighs the mitigating circumstances they find to have been established.
"[T.G.]: I do believe that they are not equal, I believe that the aggravating outweigh the other one.
"The Court: But you haven't heard the evidence of the case yet, you think you can make that decision right now?
"[T.G.]: No. That was just a brief opinion.
"The Court: Okay. Are you telling me that you could follow Alabama law or could not follow Alabama law as I explain it to you?
"[T.G.]: I could.
"The Court: And just let me go into one more thing, I am not trying to get anybody *983 to change their opinion, I just need to understand how you feel about that.
"When you said mental state, now the law allows for a jury to consider mitigating circumstances less than what the law calls insanity. A person's mental state at the time of the offense might be considered by the jury as a mitigating circumstance even if they do not meet the legal requirement of insanity defense, and I make a few statements about might happen in a case in general. I don't know if that's going to be offered, I have no idea.
"But in general, the defendant's mental state could be considered by the jury and what weight they afford it and they attach to it is for them to decide in deciding whether or not death or life imprisonment without parole is the effective punishment, assuming they have found it to exist beyond a reasonable doubt.
"And would your answer still be yes to the last question, that you could follow Alabama law?
"[T.G.]: Yes, I could."
McGowan argues that T.G. should have been excused because she stated during voir dire that she already believed that the aggravating circumstances outweighed the mitigating circumstances, that she would not consider age as a mitigating factor, and that she would not consider any mitigating circumstances other than mental state of a defendant. He argues that the failure to remove T.G. violated his right to a fair trial by an impartial jury.
This issue is raised for the first time in this appeal. McGowan did not challenge T.G. for cause, and he no objection to her serving on the jury, although he had ample opportunity to do so. T.G. served on the jury that heard the case. Because this issue was not raised below, we review it under the plain-error rule. Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991); Rule 45A, Ala. R.App. P.
The State contends that, although T.G. made the comments attributed to her on voir dire, subsequently in her voir dire conveyed to the trial court that she would follow the law as explained to her by the trial court and that, if selected as a juror, she would base her decision solely on the law and the evidence presented at trial.
While T.G. initially states, during her voir dire examination, that she was not inclined to consider age as a mitigating factor, that the only time she would be against the death penalty would be when a defendant suffered from a mental condition, and that she believed that the aggravating circumstances outweighed the mitigating circumstances, she subsequently stated that these were just her opinions, that she would have to hear the evidence before she could make a decision, and that she would follow the law as it was explained to her by the trial court. The test to be applied in determining whether a veniremember should be removed for cause is whether the venireperson can eliminate the influence of his or her previous feelings and render a verdict according to the evidence. Martin v. State, 548 So.2d 488, 490-91 (Ala.Crim.App.1988), aff'd, 548 So.2d 496 (Ala.1989). Considering T.G.'s voir dire in its entirety, it is reasonable to conclude that she could be a fair and impartial juror. We find that the trial court's failure to remove T.G. from the venire, sua sponte, did not constitute plain error.

IX.
McGowan contends that the trial court erred in granting the State's challenges for cause of veniremembers C.C., S.C., E.S., and T.W. because of their *984 views on capital punishment. A review of the record reflects that these four potential jurors indicated during a thorough voir dire questioning by the trial court, the defense counsel, and the prosecution, that they opposed the death penalty and would not consider it under any set of facts or circumstances.
"`[T]he proper standard for determining when a prospective juror may be excluded for cause because of his ... views on capital punishment is ... whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). It is not required that a prospective juror's bias in this regard be proved with `unmistakable clarity.' Id. 469 U.S. at 424, 105 S.Ct. at 852."
Coral v. State, 628 So.2d 954, 969-70 (Ala. Crim.App.1992), aff'd, 628 So.2d 1004 (Ala. 1993).
The views of the four potential jurors would have interfered with their duty, and we find that the trial court properly excused them for cause.
McGowan also contends that the use of strikes for cause or the use of peremptory strikes to exclude jurors with reservations about the death penalty is unconstitutional because those jurors are a cognizable group. We find no merit in this contention.
"In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit states from 'death qualification' of juries in capital cases and that so qualifying a jury does not deprive a defendant of an impartial jury. 476 U.S. at 173, 106 S.Ct. at 1764. Alabama courts have consistently held likewise. See Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev'd in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App. 1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985).
"Moreover, it is not improper for a prosecutor to use peremptory challenges to remove veniremembers because they have expressed strong opposition to the death penalty, regardless of whether their opposition would be sufficient to support a challenge for cause. Fisher v. State, 587 So.2d 1027, 1036-37 (Ala. Crim.App.1991), cert, denied, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992) (citations omitted)."
Sockwell v. State, 675 So.2d 4, 18 (Ala. Crim.App.1993), aff'd, 675 So.2d 38 (Ala. 1995).

X.
McGowan contends that the trial court violated his rights to due process and a fair trial by instructing the jury on complicity. He specifically argues that his right to notice of the charges against him and his right to have the evidence conform to the indictment were violated. He premises this argument on his conclusion that his indictment charged him as a principle, not as an accomplice, and the prosecution proceeded on that theory.
We review this issue for plain error; it was not first presented to the trial court. McGowan's underlying presumptionthat the indictment charged him as a principal onlyis incorrect. The indictment encompassed the conduct of an accomplice as well as that of a principal. See Smith v. State, 795 So.2d 788, 823-24 (Ala. Crim.App.2000). "Under Alabama law, the distinction between principals and accessories has long been abolished; one *985 charged as a principal may be convicted as an accomplice, and the State is not required to notify the defendant in the indictment or otherwise that it is proceeding under a complicity theory." Johnson v. State, 612 So.2d 1288, 1297 (Ala.Crim.App. 1992). Thus, there is no basis for the argument that the trial court erroneously instructed on complicity. Id.; Hyter v. State, 545 So.2d 194, 197 (Ala.Crim.App. 1988).

XI.
McGowan contends that the trial court violated his rights to due process and a fair trial by instructing the jury that "the degree of intoxication necessary to reduce a charge from murder to manslaughter when intoxication is voluntary, must be so great as to amount to insanity." He argues that this instruction deprived him of a diminished-capacity defense and of his right to have the jury consider the lesser-included offense of manslaughter. This issue was not presented to the trial court. Thus, we review it for plain error.
The court in Williams v. State, 710 So.2d 1276, 1331 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), rejected the same argument, also under the plain-error standard. After first observing that Alabama has expressly rejected the doctrine of diminished capacity and that "[a] state is not constitutionally compelled to recognize the diminished capacity doctrine," id. at 1309, the court in Williams relied on the following discussion in Ex parte Bankhead, 585 So.2d 112, 121 (Ala. 1991), in rejecting this argument:
"Bankhead contends that the court's instruction requiring that the jury, in order to find a drunkenness defense applicable, had to find Bankhead insane due to intoxication, was prejudicial. We disagree. In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Lister v. State, 437 So.2d 622 (Ala.Cr.App.1983). The same standard is applicable in homicide cases. Crosslin [v. State, 446 So.2d 675 (Ala.Cr.App. 1983), appeal after remand, 489 So.2d 680 (Ala.Cr.App.1986)]. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. A jury is capable of determining whether a defendant's intoxication rendered it impossible for the defendant to form a particular mental state."
Pursuant to the decision in Williams v. State, we find that the trial court's instruction was proper. See also Williams v. State, 795 So.2d 753, 779-80 (Ala.Crim. App.1999), aff'd, 795 So.2d 785 (Ala.2001); Minor v. State, 780 So.2d 707, 778-80 (Ala. Crim.App.1999), rev'd on other ground 780 So.2d 796 (Ala.2000).

XII.
McGowan contends that the trial court's repeated references to the jury's sentencing verdict as a "recommendation" diminished the jury's perception of its role in sentencing, in violation of Caldwell v. Mississippi 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
We need not scrutinize each comment because the jury returned a recommendation of life imprisonment without the possibility of parole. See, e.g., McMillian v. *986 State, 594 So.2d 1253, 1279 (Ala.Crim.App. 1991) (comments, even if improper under Caldwell, did not injure the defendant because the jury returned a recommendation of life imprisonment without parole), remanded on other grounds, 594 So.2d 1288 (Ala.1992), on return to remand, 616 So.2d 933 (Ala.Crim.App.1993); Hooks v. State, 534 So.2d 329, 358 (Ala.Crim.App.1987) (the comments by the trial court and the prosecutor, argued to be in violation of Caldwell, had no effect on the jury's sentencing recommendation because the jury returned a recommendation of life without parole), aff'd, 534 So.2d 371 (Ala.1988).

XIII.
McGowan contends that the trial court erred in admitting, over his objection, photographs of the bodies of the victims, and the piece of the skull of one of the victims. He argues that this evidence was cumulative and served little or no purpose except to arouse the passion, prejudice, or sympathy of the jury and that, because its prejudicial value outweighed any probative value, its admission into evidence undermined the reliability of his conviction and death sentence.
In Ex parte Loggins, 771 So.2d 1093, 1102-05 (Ala.2000), the Alabama Supreme Court reviewed the trial court's admission of approximately 50 gruesome photographs of the body of the capital-murder victim or of parts of the body that were recovered away from the body itself, depicting extensive mutilation of the body. In finding that the photographs were properly admitted even though they were gruesome and cumulative, the court reiterated the principles governing the introduction of gruesome photographs of the victim. See also Lee v. State, 898 So.2d 790, 808 (Ala.Crim. App.2003) (opinion on return to remand); Ferguson v. State, 814 So.2d 925, 944-45 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). We have reviewed the photographs in question here under those well-established principles, and we find that the photographs were relevant to depict the injuries each victim suffered and the crime scene and that they corroborated the trial testimony. Therefore, the trial court did not abuse its discretion in admitting the photographs into evidence.
We also find that the trial court did not abuse its discretion in admitting the skull fragment. The general rule is that parts of the deceased's body, including bones and their fragments, may be admitted into evidence where they are connected with the crime charged and relevant to a material issue and are not introduced merely to arouse passion and prejudice of the jury. 23 C.J.S. Criminal Law § 855 (1989). The skull fragment was admissible because it was relevant to the identity of the murder weapon. See Williams v. State, 620 So.2d 82, 87 (Ala. Crim.App.1992) (a portion of one of the victim's ribs was properly admitted to aid in identifying the murder weapon based on testimony that the knife found at the residence was the same knife that inflicted the cut on the rib); State v. Cazes, 875 S.W.2d 253, 263 (Tenn.1994) (the victim's clean and reconstructed skull was properly admitted; it was "highly relevant" in establishing identity because it "illustrate[d] the testimony of the forensic anthropologist... as he explained ... how he had found a `signature' for the murder weapon"). Cf. Lewis v. State, 220 Ala. 461, 125 So. 802 (1930) (bone fragments recovered from a fire heap were properly admitted where the testimony identified pieces of metal found with them as the remains of articles the deceased had on him when he disappeared and where other testimony was to the effect that the body had been burned at the place where the bone was found); Haney v. State, 603 So.2d 368, 396 (Ala. *987 Crim.App.1991) (a piece of human tissue recovered from the scene was properly admitted to show "the viciousness and cruelty of the assault and was relevant to the issues in the case"; "it had the same probative value as a photograph depicting the tissue at the scene"), aff'd, 603 So.2d 412 (Ala.1992). We further find that the probative value of the skull fragment in assisting the jury in determining whether the hammer in McGowan's possession was the murder weapon outweighed any danger of unfair prejudice. The trial court did not abuse its discretion in admitting the skull fragment into evidence.

XIV.
McGowan contends that the prosecution presented no evidence of an intentional murder other that the allegedly uncorroborated testimony of his accomplice, Crane.
"`A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient.'
"§ 12-21-222, Ala.Code 1975.
"`"`Corroboration need only be slight to suffice.' Ingle v. State, 400 So.2d 938, 940 (Ala.Cr.App.1981). `While corroborating evidence need not be strong, it "... must be of substantive character, must be inconsistent with the innocence of a defendant and must do more than raise a suspicion of guilt." McCoy v. State, 397 So.2d 577 (Ala.Crim. App.), cert. denied, 397 So.2d 589 (Ala.1981).' Booker v. State, 477 So.2d 1388, 1390 (Ala.Cr.App.1985). 'However, the corroboration need not be sufficiently strong by itself to warrant a conviction.' Miles v. State, 476 So.2d 1228, 1234 (Ala.Cr. App.1985). The requisite corroborative evidence is determined by a process of elimination or subtraction. Caldwell v. State, 418 So.2d 168, 170 (Ala.Cr.App.1981). `The means for analyzing the evidence to determine if there is sufficient evidence to corroborate testimony of an accomplice is to set aside the accomplice's testimony and determine whether or not the remaining evidence tends to connect the defendant with the commission of the offense.' Leonard v. State, 459 So.2d 970, 971 (Ala.Cr.App. 1984).... Circumstantial evidence is sufficient to show corroboration. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App.1984). See also McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983)."

"`Hodges v. State, 500 So.2d [1273] at 1275-76 [(Ala.Crim.App.1986)].'

"Arthur v. State, 711 So.2d 1031, 1059 (Ala.Cr.App.1996), cert, denied, 711 So.2d 1097 (Ala.1997)....
"`"Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice." Andrews v. State, 370 So.2d 320, 322 (Ala.Cr.App.), cert, denied, 370 So.2d 323 (Ala.1979)....
"`In Hood v. State, supra, this Court observed:
"`"The appellant ... insists that because the `for hire' element of the capital offense was not independently corroborated, the State did not establish a prima facie case of capital murder. That is not the law in Alabama.
"`"As early as 1867, our Supreme Court held that a charge requiring corroboration of `every *988 material part' of an accomplice's testimony Vent beyond the requirements of the statutory rule, or any rule recognized by the common law.' Montgomery v. State, 40 Ala. 684, 688 (1867). More recently, in Ex parte Bell, 475 So.2d 609, 613 (Ala.), cert, denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985), a capital case, the court held that Ala.Code 1975, § 12-21-222, `does not require corroborative testimony as to material elements of the crime; it only requires other evidence "tending to connect the defendant with the commission of the offense."' See also Andrews v. State, 370 So.2d 320 (Ala.Cr.App.), cert, denied, 370 So.2d 323 (Ala.1979), wherein this court observed:
"`"`The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. "Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony." ... Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice.'"

"`Hood v. State, 598 So.2d at 1024-25.' "Gurley v. State, 639 So.2d 557, 561-62 (Ala.Cr.App.1993).
"Thus, ... the State was not required to present corroborative evidence as to each element of the capital offense or as to each fact about which the accomplices testified. Rather, it was simply required to present other evidence that tended to connect the appellant to the commission of the offense."
Jackson v. State, 836 So.2d 915, 944-45 (Ala.Crim.App.1999) (the State was not required to present corroboration of the robbery element of the capital offense), aff'd, 836 So.2d 979 (Ala.2002). See also Ex parte Woodall, 730 So.2d 652, 659 (Ala. 1998); Ex parte Scott, 728 So.2d 172, 177-79 (Ala.1998).
We find that the State presented sufficient evidence that tended to connect McGowan with the commission of the crimes. We need look no further than the independent-witness testimony that McGowan procured the murder weapon shortly before the crimes and that he and Crane fled to other states following the murders. See Taylor v. State, 808 So.2d 1148, 1175 (Ala.Crim.App.2000) (independent evidence that the appellant participated in stealing the murder weapon was corroborative evidence), aff'd, 808 So.2d 1215 (Ala.2001); Goodwin v. State, 644 So.2d 1269, 1275 (Ala.Crim.App.1993) (evidence of flight is sufficient corroboration); 2 Charles W. Gamble, McElroy's Alabama Evidence 300.01(10) (5th ed.1996) (evidence of conduct by the accused that manifests a consciousness of guilt of the offense, such as flight or hiding with the accomplice, is sufficient corroboration).
Accordingly, we hold that McGowan's issue is without merit.

XV.
McGowan contends that the trial court erroneously denied his motion to dismiss the indictment and challenge to the composition of the grand and petit juries based on the allegation of systematic under representation of African-Americans and women.
Federal census evidence offered by McGowan indicated that the composition of the adult population in Conecuh County in *989 1990 was. 37.64% African-Americans and 0.92% Hispanic or another minority race, thus whites comprised the remaining 61.44% of the population. The parties did not offer evidence of the census breakdown of women versus men except that of the total population of Conecuh County (not limited to those over 19 years old), 52.7% were women. The venire list for the grand- and petit-jury selection was computer generated by the Administrative Office of Courts ("AOC"), using a list of people who were over 19 years of age and who were either licensed drivers in Conecuh County or who had an identification card.
Of those on the grand-jury selection list, 66.09% were white; 33.73% were African-Americans; 48.64% were women; and 51.36% were men. The statistical disparity between the percentage of African-Americans eligible for jury service in Conecuh County and the percentage on the list was about 4%. Defense counsel admitted that there was no significant disparity between the ratio of men to women in the population and the ratio on the grand-jury selection list, and the trial court stated that the disparity was 5%. (The 18-member grand jury consisted of 11 African-Americans; 7 whites; 9 women; and 9 males; and the foreperson was an African American female.) We note that defense counsel, at the January 31, 1995, hearing, stated that "there has been, in my judgment, absolutely no discrimination in the selection of grand juries or persons in this county and that is for this case, also," but that he was contesting the method of selection used by AOC.
In regard to the list from which the petit jury would be selected, McGowan's objection was anticipatory, i.e., he did not object after the venire list was prepared. He simply included in his motion to dismiss the allegation that the petit-jury list would reflect an under representation of African-Americans and women. We find that his subsequent motion to challenge the jury venire did not clearly assert the issue now raised. However, we have taken the venire list and calculated the following statistics: 45% were African American; 55% were white; 55% were female; and 45% were male. (The jury consisted of seven African-Americans, five whites, seven females, and five males.)
In rejecting McGowan's argument, we need look no further than Travis v. State, 776 So.2d 819 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), in which the appellant alleged that Conecuh County's jury-selection process violated the fair cross-section requirement of the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In rejecting this contention, the court in Travis stated:
"In Ex parte Land 678 So.2d 224 (Ala.1996), the Alabama Supreme Court set out the burden of proof necessary to raise a `fair cross-section' argument:
"`Although the State concedes that African-Americans constitute a distinctive group for equal protection purposes, it argues that, even assuming Land's census calculations are correct, he failed to establish that there, had been a systematic exclusion of African-Americans from the venire. Citing Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the State argues that Land has failed to establish all the elements needed to prove a violation of the constitutional requirement that a jury be taken from a fair cross-section of the community.
"`In Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the United States Supreme *990 Court held that the systematic exclusion of women from the jury selection process deprived the defendant of his rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution to have his jury selected from a fair cross-section of the community. Then in Duren, supra, the Court stated:
"`"In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury selection process."

"`Duren v. Missouri, 439 U.S. at 364, 99 S.Ct. at 668. See Ex parte Dobyne, 672 So.2d 1354 (Ala.1995). In Duren, the Supreme Court held that the defendant had met the third prong of the test, the most difficult one: "His undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of a year manifestly indicates that the cause of the under representation was systematicthat is, inherent in the particular jury selection process utilized." Duren v. Missouri, 439 U.S. at 366, 99 S.Ct. at 669. Land, however, has offered no evidence toward meeting the third prong of the test established in Duren. Thus, we conclude that Land's argument on this issue is without merit.'

"Ex parte Land, 678 So.2d at 244.
"Moreover, in Stanton v. State, 648 So.2d 638 (Ala.Cr.App.1994), this Court specifically approved the jury selection method employed by Conecuh County.... In rejecting the appellant's claim, this Court stated, in pertinent part, as follows:
"`... [T]he trial court took judicial notice that prospective jurors in Conecuh County are "randomly select[ed]" by computer from those Conecuh County residents "holding driver's licensed and identity cards." R. 97-98. Although noting that blacks constitute "about 37, 38% of the [jury] eligible population in Conecuh County," and that "[t]his jury panel, as it ends up on the strike list after challenges for cause, is composed of 20% black and 80% white," the court specifically found "nothing wrong with the selection procedure." R. 98-99. This finding was correct. "Random selection from a list of licensed drivers has been held to be an acceptable manner in which to select a jury. See Stewart v. State, 623 So.2d 413 [, 415] (Ala.Cr.App.1993); Joyce v. State, 605 So.2d 1243, 1245 (Ala.Cr.App.1992)." Sistrunk v. State, 630 So.2d 147, 149 (Ala.Cr.App.1993).
"`....
"`"The third Duren [v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)] elementthat there has been a systematic exclusion of a distinctive groupconstrains a defendant to establish that `the cause of the under representation was ... inherent in the particular jury-selection process utilized.' Duren, 439 U.S. at 366, 99 S.Ct. at 669." Sistrunk v. State, 630 So.2d at 149. Additionally, "with regard to the second and third Duren elements, a defendant asserting a fair cross-section violation `must demonstrate ... not only that [blacks] *991 were not adequately represented on his jury venire, but also that this was the general practice in other venires.' Timmel v. Phillips, 799 F.2d 1083, 1086 (5th Cir.1986)." Sistrunk v. State, 630 So.2d at 150. In this case, there was absolutely no showing either that random computerized selection of licensed drivers inherently results in under representation of blacks on jury venires in Conecuh County or that blacks had been underrepresented on other venires in Conecuh County.'

"Stanton, 648 So.2d at 640-41.
"The appellant has clearly failed not only to prove that the representation of blacks on Conecuh County jury venires is not fair and reasonable in relation to the number of blacks in the community, but also to make any showing that any under representation was due to the systematic exclusion of blacks in the Conecuh County jury selection process. Stanton, 648 So.2d at 640.
"Moreover, it is the source from which the venire is selected that must be fairly representative of the community, rather than the jury actually chosen. `"The United States Constitution does not require an exact proportion between the percentage of blacks in the population and those on the jury list. What is required is that no qualified person can be excluded from jury service." Jackson v. State, 549 So.2d 616, 619 (Ala. Crim.App.1989).' Pierce v. State, 576 So.2d 236, 242-43 (Ala.Cr.App.1990), . cert, denied, 576 So.2d 258 (Ala.1991). See also, Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990)."
776 So.2d at 837-38. See also Gavin v. State, 891 So.2d 907 (Ala.Crim.App.2003); Acklin v. State, 790 So.2d 975, 984-86 (Ala. Crim.App.2000).
Based on the foregoing, we conclude that McGowan failed to meet his burden of proving that African-Americans and females were underrepresented on the grand-jury and petit-jury master lists. The selection process for the grand and petit juries did not violate the fair cross-section requirement of the Sixth Amendment or the Equal Protection Clause. The trial court properly denied his motion to dismiss the indictment and his challenge to the selection of the grand and petit juries.

XVI.
McGowan contends that his three attorneys did not meet the minimum statutory requirements to represent a capital defendant: counsel appointed for an indigent defendant indicted for a capital crime must have "no less than five years' prior experience in the active practice of criminal law." § 13A-5-54, Ala.Code 1975. Counsel appointed for McGowan filed a motion, 18 days before trial, for the trial court to determine whether their qualifications met the statute because of their concern that their experience did not meet the statutory requirement. In this motion, Counsel Broox G. Garrett, Jr., averred that he had not represented a "felony criminal defendant" within the last 10 years; that he had not tried a felony case in more than 10 years; and that he has handled several misdemeanor cases in the district court. He concluded: "The nature of his practice could not in any way be considered to be the `active practice of criminal law" and his practice is primarily of a civil nature and his trial experience in criminal cases is extremely limited. Within the last ten (10) years it is nonexistent." (CR. 288.) In the hearing on this motion, Garrett stated that, since he began practicing law in 1973, he has not been active in criminal practice and that, in his opinion, he was not qualified under the experience requirement of *992 § 13A-5-54. Counsel Edward T. Hines averred in the motion that, in more than the 10 years before to his appointment to this case, he has tried only one felony case and seven misdemeanor cases. He averred that the nature of his practice is primarily civil law, domestic relations, and real estate. (Counsel, in the motion, also stated that the third cocounsel, John G. Brook, at the time of appointment, had been licensed to practice law for less than five years.)
The trial court expressly found that Hines and Garrett were "very well qualified." (CR. 287.) In the hearing on this motion, the trial court made the following specific findings:
"I have read your motion and looked at the Jacobs case [Jacobs v. State, 371 So.2d 429, 443 (Ala.Crim.App.1977), rev'd on other ground, 371 So.2d 448 (Ala.1979)] and I find that both of you are well qualified to try this case. You may not have handled a lot ofof felony cases, but, both of you are active civil litigators with an exemplary reputation as litigants, further, each of you have handled criminal cases in the past and each of [you] have been practicing law for quite a number of years, ... many more than five years. This is not a situation where I have a young, inexperienced lawyer trying the case. I have two experienced and able litigators trying this case. And you have not shown any lack of diligence nor have you shown any lack of ability in this case. In fact, you have shown a great deal of ability and you have done everything I would have expected a lawyer to do in the case and ... some I wouldn't have thought of....
"I'll take judicial knowledge of the fact that in a small circuit such as this, in a small circuit you come from, from the 21st Circuit, that we have no lawyers who only handle criminal cases. The closest specialist we have in this area, that I know of, is Paul Harden, and even Paul Harden handles a number of civil matters.... So in the environment that we live in, a general practicing lawyer, such as yourself, takes criminal cases and civil cases and we don't have specialist. And I don't believe that this statute calls for that.
"[T]he statements I'm making with regard to your motion are based on my personal experience with both of the lawyers. I consider them among the finest lawyers practicing in southwest Alabama. I've had both of them ... in my Court on numerous occasions in various matters and I've always found them to be very able and competent lawyers....
"I think in view of all the circumstances that y'all are qualified to do this job."
(R. 451-53, 454-55, 457, 458.)
As noted early on in the application and interpretation of this statutory requirement, "[j]ust what is meant by this provision is an enigma." Jacobs v. State, 371 So.2d 429, 444 (Ala.Crim.App.1977), rev'd on other ground, 371 So.2d 448 (Ala. 1979). As the court in Jacobs, "[w]e have not been cited to a case, nor has our research revealed one, that gives a concise definition of what is meant by such a provision." Id. However, it is clear that counsel's proclamation that he does not consider his experience to constitute the required five years' prior experience in the active practice of criminal law is not controlling. See Parker v. State, 587 So.2d 1072 (Ala. *993 Crim.App.1991), aff'd, 610 So.2d 1181 (Ala. 1992).
In 1989, the American Bar Association promulgated minimum standards for counsel representing a defendant in death-penalty cases. See American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989). The Commentary to Guideline 5.1, which includes an experiential requirement as one of the eligibility requirements, notes the following:
"This Guideline acknowledges that there are many attorneys who do not possess the experiential criteria detailed in the Guideline, but who should receive appointments because they will provide competent representation at trial.... Such attorneys may have criminal law experience which does not meet the experiential criteria, may have attended training in death penalty defense representation or may have substantial experience in civil practice. These attorneys should receive appointments if the appointing authority is satisfied the defendant or inmate will be provided with the same quality of representation as clients represented by attorneys who met the experiential criteria. Attorneys who are appointed under the `Alternate Procedures' clauses of this Guideline obviously have an obligation to consult with other attorneys who are expert in death penalty defense, to attend specialized training and to do whatever else is necessary to allow them to provide competent representation to their clients."
The Florida Supreme Court, in adopting a rule of criminal procedure concerning the competency and qualifications of capital-litigation attorneys, added a provision that "permits trial courts in exceptional circumstances to appoint attorneys who may not satisfy the technical requirements of the standards, but in whom the appointing trial court has complete and unqualified confidence as to the quality of representation." In re Amendment to Florida Rules of Criminal ProcedureRule 3.112 Minimum Standards for Attorneys in Capital Cases, 759 So.2d 610, 613 (Fla. 1999). In explaining its reasoning for that provision, the court stated, "We ... recognize that it is possible that some counties in the state may not have enough lawyers available who meet the technical requirements of the standards." Id.
Here, the trial court and, in turn, this court are faced with "exceptional circumstances" that do not fit neatly in the limitation of § 13A-5-54. In Ex parte Berryhill, 801 So.2d 7, 10 (Ala.2001), the Alabama Supreme Court, in discussing its interpretation of § 13A-5-54 on a different point, stated: "As we must with any statute, we read the concept of reasonableness into the provisions of the statute at issue in this case." The Court further stated the following:
"Clearly, the Legislature, by enacting this provision, intended that an indigent defendant charged with a capital offense have experienced appointed counsel at all critical phases of the initial adjudicative process for which a defendant is entitled to effective assistance of counsel....
"....
"... The obvious reason the Legislature required appointment of experienced counsel was to ensure that persons subject to the most severe form of punishment are provided with competent and effective representation. Simply stated, the Legislature sought to protect the rights of indigents charged with capital offense by providing them with experienced advocates."
801 So.2d at 10-11.
In reviewing the trial court's appointment of Garrett and Hines, we find *994 that the intent of § 13A-5-54 was followed. While the technical requirement of the statute may not have been met, the obvious objective and intent of the statuteeffective counsel for an indigent capital litigantwas fulfilled. We find the following pertinent:
"These standards are not intended to establish any independent legal rights. For example, the failure to appoint cocounsel,[[7]] standing alone, has not been recognized as a ground for relief from a conviction or sentence. See Ferrell v. State, 653 So.2d 367 (Fla.1995); Lowe v. State, 650 So.2d 969 (Fla.1994); Armstrong v. State, 642 So.2d 730 (Fla.1994). Rather, these cases stand for the proposition that a showing of inadequacy of representation in the particular case is required.' See Strickland v. Washington, 466 U.S. 668 (1984)."
Committee Comments to Rule 3.112, Fla. R.Crim. P.
In allowing McGowan's conviction to stand, we are gravely concerned that the breadth of an exception may swallow the requirement of § 13A-5-54. We are not authorizing courts to exercise unbridled discretion to appoint unqualified attorneys. The intent of the statute must be followed. We must also emphasize that the trial court puts a conviction in jeopardy by ignoring the statutory requirement.
Yet, while we can never condone blatant disregard for a legislative mandate, we find that the convergence of the particular circumstances herea rural circuit where the pool of attorneys available did not contain even one available attorney that would optimally meet the requirement of the statute, the extensive pretrial work done by prior counsel, the exceptional quality and reputation of the two lead counsel, the fact that lead counsel had already been appointed in the other capital case pending against McGowan, McGowan's express approval that the trial court recruit lead counsel for this case, the lack of complexity of the facts and evidence, the jury's recommendation of life imprisonment without the possibility of parole, and, of utmost importance, the excellent representation given by the attorneysmeets the intent of the Legislature, whereas reversal of this conviction would not. McGowan unquestionably received the same quality or better quality of representation he would have received had he been represented by an attorney who met the five-year experiential requirement.
As a final note, in interpreting § 13A-5-54 in the manner we have in this opinion, we do not do so lightly. In so commenting, we adopt the following as our own:
"This Court has an inherent and fundamental obligation to ensure that lawyers are appointed to represent indigent capital defendants who possess the experience and training necessary to handle the complex and difficult issues inherent in death penalty cases. This Court, over the years, has reviewed countless ineffective assistance of counsel claims alleging incompetence of counsel at both the trial and appellate levels. This experience demonstrates that we cannot ignore the compelling need to focus attention on the initial process whereby private counsel are appointed, in order to improve the quality of the process and minimize later claims of incompetency.
"... The integrity of the process and our society's confidence in the outcome *995 of capital proceedings rests on our allegiance and commitment to the highest standards of our justice system."
759 So.2d at 613-14. Whenever a decision is made as to approving an attorney who does not technically meet the five-year experience requirement, it must be made properly, carefully, and within the most narrowly tailored limitations.
Moreover, even if our interpretation of § 13A-5-54, Ala.Code 1975, is inconsistent with the intent of the Legislature, any error that occurred in the failure to comply with the technical requirements of § 13A-5-54, was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We have diligently searched the record and we agree with the trial court that McGowan's attorneys were "very able and competent."

XVII.
McGowan contends that, although the trial court granted his motion for full recordation of all proceedings, the trial court failed to ensure that all proceedings were transcribed and, thus, he is being denied a full and meaningful appellate review. Pursuant to this court's order, the record was supplemented to include the two pretrial hearings specified by McGowan.
Thus, the only remaining contention is McGowan's notation of four pages that, he argues, supports his assertion that "crucial bench conferences" were not transcribed.[8]
In reviewing the circumstances of the three bench conferences cited by McGowan, we have been mindful of the following passage from Ex parte Harris, 632 So.2d 543, 545-46 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995):

"`"When, [as in this case], a criminal defendant is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is *996 sufficient to mandate reversal.... [W]hen a defendant is represented on appeal by counsel not involved at trial [as in this case], counsel cannot reasonably be expected to show specific prejudice. To be sure, there may be some instances where it can readily be determined from the balance of the record whether an error has been made during the untranscribed portion of the proceedings. Often, however, even the most careful consideration of the available transcript will not permit us to discern whether reversible error occurred while the proceedings were not being recorded. In such a case, to require new counsel to establish the irregularities that may have taken place would render illusory an appellant's right to [have the reviewing court] notice plain errors or defects....

"`"We do not advocate a mechanistic approach to situations involving the absence of a complete transcript of the trial proceedings. We must, however, be able to conclude affirmatively that no substantial rights of the appellant have been adversely affected by the omissions from the transcript. When ... a substantial and significant portion of the record is missing, and the appellant is represented on appeal by counsel not involved at trial, such a conclusion is foreclosed...."'

"Ex parte Godbolt, 546 So.2d [991,] at 997 [(Ala.1987)]. (Citations omitted; emphasis added [in Harris].) (Quoting with approval United States v. Selva, 559 F.2d 1303, 1305-06 (5th Cir.1977))."
After reviewing those portions of the record where each cited omission occurred and having read the several pages before and the several pages after those omitted portions, we hold that the cited bench conferences were not substantial and significant portions of the record and that no substantial rights of McGowan have been adversely affected by the omissions from the transcript. Any error was harmless.

XVIII.
McGowan contends that the use of the robbery component of the capital offense of robbery-murder as an element of the offense and as an aggravating circumstance, i.e., "double-counting," is unconstitutional. He argues that, in his case, double-counting failed to narrow the class of cases eligible for the death penalty, resulting in the arbitrary imposition of the death penalty, and that it subjected him to two punishments, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and state law.
Contentions identical to those presented here have been repeatedly rejected. See, e.g., Lee v. State, 898 So.2d 790, 871-72 (Ala.Crim.App.2003); Smith v. State, 838 So.2d 413, 469 (Ala.Crim.App.), cert, denied, 537 U.S. 1090, 123 S.Ct. 695, 154 L.Ed.2d 635 (2002); Broadnax v. State, 825 So.2d 134, 208-09 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), cert, denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002); Ferguson v. State, 814 So.2d 925, 956-57 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001), cert, denied 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002); Taylor v. State, 808 So.2d 1148, 1199 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001); Jackson v. State, 836 So.2d 915, 958-59 (Ala.Crim.App.1999), remanded on other ground, 836 So.2d 973 (Ala.2001), aff'd, 836 So.2d 979 (Ala.2002); Maples v. State, 758 So.2d 1, 70-71 (Ala. Crim.App.1999), aff'd, 758 So.2d 81 (Ala. 1999).

*997 XIX.
McGowan contends that the trial court's override of the jury recommendation of imprisonment for life without the possibility of parole violated his rights to due process and equal protection because, he argues, the trial court can arbitrarily override "without reference to any uniform norm or standard." (McGowan's brief, p. 62.) He further asserts that "there is no appellate mechanism for ensuring evenhandness." (McGowan's brief, p. 67.)
These arguments have been rejected. See Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), cert, denied, 540 U.S. 968, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003); Ex parte Taylor, 808 So.2d 1215 (Ala.2001).
However, we must remand to allow the trial court to enter a revised sentencing order containing written findings stating specific reasons for giving the jury's recommendation the consideration it gave it. The Court in Ex parte Taylor, 808 So.2d at 1219, decided after McGowan's case was argued and submitted, stated the following:
"Under Alabama's capital-sentencing procedure, the trial judge must make specific written findings regarding the existence or nonexistence of each aggravating circumstance and each mitigating circumstance offered by the parties. § 13A-5-47(d), Ala.Code 1975. In making these findings, the trial judge must consider a jury's recommendation of life imprisonment without parole. See § 13A-5-47(e), Ala.Code 1975 ('in [weighing the aggravating and mitigating circumstances] the trial court shall consider the recommendation of the jury contained in its advisory verdict'). Construing subsection (e) together with subsection (d), we conclude that the trial judge must state specific reasons for giving the jury's recommendation the consideration he gave it."
(Footnote omitted; alterations in original.)
Moreover, on remand, the trial court is to consider the jury's life-without-parole recommendation as a mitigating circumstance in accordance with Ex parte Carroll, 852 So.2d 833 (Ala.2002), wherein the Alabama Supreme Court stated the following:
"We take this opportunity to further explain the effect of a jury's recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the `triggerman' or a recommendation of leniency by the victim's family; the jury's recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance."
852 So.2d at 836 (footnote omitted).
On a related matter, we asked that the parties submit supplemental arguments in light of Ring v. Arizona, 536 U.S. 584, 589, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in which the Supreme Court held, "Capital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."[9] McGowan argues, *998 "The Court's ruling invalidates critical aspects of Alabama's capital sentencing scheme and renders Mr. McGowan's death sentence unconstitutional." (McGowan's suppl. brief, p. 9.) He specifically asserts (1) that the factual determinations of the existence of aggravating circumstances beyond a reasonable doubt and that the aggravating circumstances outweighed the mitigating circumstances must be reliably made by the jury instead of by the judge; (2) that the record does not provide a basis for concluding what aggravating circumstances the jury unanimously found to exist beyond a reasonable doubt; (3) that the especially "heinous, atrocious, or cruel" aggravating circumstance was found by the trial court, rather than by the jury, and was not specified in the indictment; and (4) that state and federal law now condemn the imposition of a death sentence by the trial court rather than by the jury.
"[B]oth this Court and the Alabama Supreme Court have agreed with the State's argument that Ring did not invalidate Alabama's law, which vests the ultimate sentence determination in the hands of the trial judge, and not a jury." Martin v. State, 931 So.2d 736, 756 (Ala.Crim.App. 2003). See also Lee v. State, 898 So.2d 790 (Ala.Crim.App.2001). Because the jury convicted McGowan of one count of murder during a first-degree robbery, a violation of § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, § 13A-5-49(4) was "proven beyond a reasonable doubt." §§ 13A-5-45(e); -5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. § 13A-5-45(f). Thus, the jury, and not the trial court, determined the existence of the "aggravating circumstance necessary for imposition of the death penalty," as required by Ring, 536 U.S. at 609, 122 S.Ct. 2428. See also Ex parte Hodges, 856 So.2d 936 (Ala.2003). The trial court's subsequent determination that the murders were especially heinous, atrocious, or cruel as compared to other capital offenses, § 13A-5-49(8), was "a factor that ha[d] application only in weighing the mitigating circumstances and the aggravating circumstances, a process that ... is not an `element' of the offense." Ex parte Waldrop, 859 So.2d at 1190. The trial court's application of that aggravating circumstance did not violate Ring. See also Ex parte Hodges; Martin v. State.
In June 2002, the United States Supreme Court reversed its 1989 holding in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and held that "evolving standards of decency" prohibited the execution of the mentally retarded. See Atkins v. Virginia, 536 U.S. 304, 312, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In light of this decision and the evidence in the record concerning McGowan's IQ, we requested that the parties brief the impact of the decision in Atkins on McGowan's death sentence.
McGowan argues in his supplemental brief that every expert who has conducted IQ tests on him has found that he is mentally retarded, that he has the mental age of a 10-year-old, and that he reads at a third-grade reading level. He asserts that Atkins forbids his execution.
The State argues that the evidence in the record does not show that McGowan meets even the broadest definition of mental retardation. It contends that McGowan's death sentence should stand.
Though Alabama has yet to enact legislation to address the Atkins holding, the Alabama Supreme Court in Ex parte Perkins, *999 851 So.2d 453 (Ala.2002), on remand from the United States Supreme Court, applied the broadest definition of mental retardation recognized in those states that prohibit the execution of the mentally retarded.[10] The Perkins Court stated:
"Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."
851 So.2d at 456. In upholding Perkins's death sentence the Supreme Court noted that Perkins had a full scale IQ of 76 and that he had maintained jobs and interpersonal relationships.
There is no evidence in the record indicating that McGowan has significant or substantial deficits in adaptive behavior or that his IQ is significantly subaverage. McGowan's expert testified that McGowan has a full scale IQ of 76. The presentence report reflects that McGowan had been married twice and that he had one child from his first marriage. The report also shows that McGowan had maintained construction jobs in Texas, California, Louisiana, Alabama, and in Floridauntil he had a job-related accident. McGowan's brother testified that he and McGowan owned a mechanic shop. The record also reflects that McGowan used his time in prison by taking classes to obtain a high school diploma. There is nothing in the record that prohibits the State from imposing the death sentence on McGowan. McGowan's death sentence does not violate Atkins. See Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003); Ex parte Perkins, supra; Gavin v. State, 891 So.2d 907 (Ala.Crim.App.2003); Adams v. State, 955 So.2d 1037 (Ala.Crim.App.2003); Stallworth v. State, 868 So.2d 1128, 1178 (Ala.Crim.App.2001) (opinion on return to second remand).

XX.
McGowan contends that the trial court erred in denying his motion for a judgment of acquittal because, he argues, the prosecution's evidence was insufficient to support his convictions for capital murder. He specifically asserts that the prosecution presented no eyewitness testimony showing that he killed the victims, no forensic evidence linking him to the scene, and no item belonging to the victims found in his possession.
Foremost, we dispute McGowan's characterizations of the evidence. The State did present an eyewitness: Crane. Forensic evidence did link McGowan to the scene: the forensic analysis of the hammer that McGowan had procured shortly before the murders, showing that it was used to murder Mrs. Johnson. The evidence further supports the reasonable inference that McGowan did possess something belonging to one of the victims: the money that McGowan gave to "Rerun" to purchase crack cocaine, but had to get back to flee out of state.
Moreover, in observing the following principles of law, we find that McGowan's argument is without merit:
"`"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all *1000 evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Cr. App.1984), aff'd, 471 So.2d 493 (Ala. 1985)." Powe v. State, 597 So.2d 721, 724 (Ala.1991). It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt, Pennington v. State, 421 So.2d 1361 (Ala.Cr.App.1982); rather, the function of this Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. Davis v. State, 598 So.2d 1054 (Ala.Cr. App.1992). Thus, "[t]he role of appellate courts is not to say what the facts are. [Their role] is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978) (emphasis original).'"
Ex parte Pilley, 789 So.2d 888, 894 (Ala. 2000) (quoting Ex parte Woodall, 730 So.2d 652, 658 (Ala.1998)).
Viewing the evidence set out earlier in our opinion and accepting as true all of the State's evidence, according the State all legitimate inferences therefrom, and viewing the evidence in a light most favorable to the State, we find that the State presented sufficient evidence from which the jury could have reasonably concluded that McGowan possessed the intent to kill, that he robbed Mr. Johnson, and that he committed the capital murders. The trial court's denial of McGowan's motion for a judgment of acquittal was not error.

XXI.
McGowan (who is a Caucasian) contends that his death sentence violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law because, he argues, it was sought and imposed pursuant to a racially discriminatory pattern. He argues that, had the victims been African-American and poor, instead of Caucasian, the prosecutor would not have sought the death penalty and the trial court would not have sentenced him to death.
We first note that McGowan's death sentence was imposed by the trial court after it had rejected the recommendation by the jury of life imprisonment without the possibility of parole. Furthermore, McGowan does not support his claim with any evidence. In rejecting his argument, we find the following applicable:
"We have previously stated that the judicial override provides the justice system with another opportunity to achieve rational results in capital cases. Ex parte Giles, 632 So.2d 577 (Ala.1993), cert, denied, 513 U.S. 1199, 115 S.Ct. 1271, 131 L.Ed.2d 149 (1995); Ex parte Hays, 518 So.2d 768 (Ala.1986). There is nothing in the record of this case to support or even to suggest in the slightest way that race influenced the `decisionmakers' or played any role in the appellant's conviction and sentence. The record discloses that every effort was made to ensure that the appellant received a fair trial, and we believe that he did. McMillian v. State, 594 So.2d 1253 (Ala.Cr.App.1991)."
Stewart v. State, 730 So.2d 1203, 1242 (Ala. Crim.App.1996), aff'd, 730 So.2d 1246 (Ala. 1999). See also Woods v. State, 789 So.2d 896, 939 (Ala.Crim.App.1999) (in rejecting a similar claim, the court noted that the appellant's "argument consists of only one paragraph and it fails to cite any instance of alleged racial bias"), aff'd, 789 So.2d 941 (Ala.2001); McNair v. State, 706 So.2d 828, 844 (Ala.Crim.App.1997) (the appellant, who had presented no evidence to *1001 support his contentions, failed to meet his burden of proving that his death sentence had been sought and imposed pursuant to a pattern of racial bias).

XXII.
McGowan asserts that the sentencing order is defective because the trial court did not enter specific findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, as required by § 13A-5-47(d). Instead, the trial court specifically found the existence of the aggravating circumstances that the murder was committed while McGowan was engaged or was an accomplice in the commission of robbery, § 13A-5-49(4), and that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, § 13A-5-49(8).
Because we are remanding for a new sentencing order, we also instruct the trial court to include, in its new sentencing order, specific findings of fact regarding those aggravating circumstances in § 13A-5-49 that it finds not to exist.
We further instruct the trial court, in its new sentencing order, to comply with Ex parte Kyzer, 399 So.2d 330 (Ala.1981), by making specific findings of fact as to why it believes that the aggravating circumstance of § 13A-5-49(8) exists. See Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002).

XXIII.
McGowan contends that § 15-12-21(d), which limited court-appointed attorneys' fees to $1,000 (at $20 per hour) for out-of-court work in each phase of a capital-murder trial, is unconstitutional.[11] Specifically, he asserts that this limitation on compensation violated the separation-of-powers doctrine; that it constituted a taking of property without just compensation; that it deprived an indigent capital defendant of effective assistance of counsel; and that it denied the indigent defendant equal protection of the law.
"The Alabama Supreme Court, as well as this court, has addressed these same contentions in a number of previous cases and has consistently rejected them." Ingram v. State, 779 So.2d 1225, 1279 (Ala. Crim.App.1999), aff'd, 779 So.2d 1283 (Ala. 2000). See, e.g., Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001), cert, denied, 868 So.2d 1189 (Ala.2003); McWhorter v. State, 781 So.2d 257 (Ala. Crim.App.1999), aff'd, 781 So.2d 330 (Ala. 2000); Whitehead v. State, 777 So.2d 781 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000). We find the following apropos here:
"No facts or data are shown in the record to support any of [the appellant's] contentions. Thus, we find no basis to warrant a reexamination of our prior holdings on these issues.
"The record reflects that [the appellant] has been ably represented at trial and on appeal by experienced counsel. It does not indicate in any way that counsel's efforts were deterred or diminished by the fees and expenses allowed by the statute. We find no merit in any of the contentions raised, and certainly no plain error."
Ingram v. State, 779 So.2d at 1279.

XXIV.
McGowan further contends that Alabama's manner of execution by electrocution *1002 constitutes cruel and unusual punishment. He argues that the State "will utilize faulty equipment, unqualified personnel, and inadequate procedures." (McGowan's brief, p. 72.)
In addressing this issue, we reiterate the following:
"Recently, the Alabama Legislature amended § 15-18-82, Ala.Code 1975, which provides for the time, place, and method of executions in Alabama, and added § 15-18-82.1, Ala.Code 1975. Section 15-18-82.1(a) provides:
"`A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution. The sentence shall be executed pursuant to Section 15-18-82.'
"Section 15-18-82(a), as newly amended, now reads:
"`Where the sentence of death is pronounced against a convict, the sentence shall be executed at any hour on the day set for the execution, not less than 30 nor more than 100 days from the date of sentence, as the court may adjudge, by lethal injection unless the convict elects execution by electrocution as provided by law. If electrocution is held unconstitutional, the method of execution shall be lethal injection.'
"These sections became effective July 1, 2002, and they apply to all inmates currently on death row. Because the primary method of execution in Alabama has been changed from electrocution to lethal injection, Lewis's argument is moot. See Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002); Tomlin v. State, 909 So.2d 213 (Ala.Crim.App. 2002); Harrison v. State, 869 So.2d 509 (Ala.Crim.App.2002); and Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002)."
Lewis v. State, 889 So.2d 623, 688-89 (Ala. Crim.App.2003).

XXV.
McGowan contends that the cumulative effect of all of alleged errors discussed in this opinion violates his rights to due process and a fair trial and, thus, entitles him to a new trial.
The cumulative-error rule expressed by the Supreme Court is "that, while, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have `probably injuriously affected substantial rights of the parties,' then the cumulative effect of the errors may require reversal." Ex parte Woods, 789 So.2d 941, 942 n. 1 (Ala.2001). See also Ex parte Centobie, 861 So.2d 1145 (Ala.2003)(on rehearing ex mero motu); Ex parte Bryant, 951 So.2d 724 (Ala.2002). Applying this standard to the allegations of cumulative error, we find that McGowan's substantial rights have probably not been injuriously affected. Therefore, McGowan's claim is without merit.
Accordingly, this case is remanded for the trial court to comply with our directions in Parts XIX. and XXII. supra. Due return should be filed in this Court no later than 120 days from the date of this opinion.
REMANDED WITH INSTRUCTIONS.
McMILLAN, P.J., and WISE, J., concur; SHAW, J., concurs in part and concurs in the result in part, with opinion, joined by BASCHAB, J.; COBB, J., recuses herself.
SHAW, Judge, concurring in part and concurring in the result in part.
I concur in all parts of the main opinion except Part XVI, as to which I concur in *1003 the result. I find it unnecessary to construe § 13A-5-54, Ala.Code 1975, to authorize exceptions to the requirement of the appointment of counsel who have at least five years' prior experience in the active practice of criminal law. I note that "[t]he obvious reason the Legislature required appointment of experienced counsel was to ensure that persons subject to the most severe form of punishment are provided with competent and effective representation." Ex parte Berryhill, 801 So.2d 7, 11 (Ala.2001). The record indicates that McGowan received competent and effective representation. Therefore, for purposes of reviewing this issue, and under the unique circumstances of this case, I am satisfied that, even if the failure to comply with the letter of the statute was error, it was error without injury.

On Return to Remand
PATTERSON, Retired Appellate Judge.[1]
The appellant, James William McGowan, was convicted of two counts of capital murder for murdering Hiram E. Johnson and Mamie Lucille Johnson during one act or pursuant to one course of conduct, and for murdering Hiram Johnson during the course of a robbery, violations of §§ 13A-5-40(a)(10) and 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 5 to 7, recommended that McGowan be sentenced to life imprisonment without the possibility of parole. The circuit court overrode the jury's recommendation and sentenced McGowan to death.
On direct appeal we remanded this case for the circuit court to correct its sentencing order to comply with § 13A-5-47(d), Ala.Code 1975, by making specific findings about the existence or nonexistence of each aggravating circumstance set out in § 13A-5-49, Ala.Code 1975, and to make specific findings as to the aggravating circumstance that it found to exist  that the murders were especially heinous, atrocious, or cruel as compared to other capital murders. See McGowan v. State, 990 So.2d 931 (Ala.Crim.App.2003). We further instructed the circuit court to set out the reasons it chose not to follow the jury's recommendation but instead sentenced McGowan to death. The circuit court has complied with our instructions and has forwarded an amended sentencing order to this court.[2]

I.
The circuit court specifically found the existence of two aggravating circumstances  that the murders were committed during the course of robbing Hiram Johnson and that the murders were especially heinous, atrocious, or cruel as compared to other capital murders. See §§ 13A-5-49(4) and 13A-5-49(8), Ala.Code 1975. The aggravating circumstance that the murders were committed during the course of a robbery was found by the jury to exist beyond a reasonable doubt by its verdict in the guilt phase. The circuit court stated the following concerning the aggravating circumstance that the murders were especially heinous, atrocious, or cruel:

*1004 "This court specifically finds that the death of Hiram Johnson, an elderly man, by repeated blows to the head with a hammer, beginning while he was upright, and continuing while he was on his hands and knees would have caused great pain and appreciable suffering beyond that of other capital murder cases. The use of many blows is atrocious. The infliction of great pain is heinously cruel. The decedent would not have been able to maintain a posture on his hands and knees if he were not conscious. The death of his elderly wife, Mamie Johnson, was caused by repeated hammer blows to the head while she was in her bed. She was in a position to see the killing of her husband and was attempting to get out of bed when she was killed. She was forced to see the manner of her own death before being killed in the same manner as her husband. This was torturous and must have caused her great fear, anguish, and psychological pain prior to her own death.
"....
"The Court finds beyond a reasonable doubt and to a moral certainty that the murder was committed under the aggravating circumstance set out in § 13A-5-49(8) Code of Alabama, 1975, and that it fits in that category of murders which are `conscienceless or pitiless homicides which are unnecessarily tortuous to the victim.' Ex parte Kyzer, 399 So.2d 330 (Ala.1981) wherein the Alabama Supreme Court defined this aggravating circumstances as delineated in § 13-11-6(8), the predecessor to the current statute setting forth aggravating circumstances. The Court finds that this aggravating circumstance exists."
When evaluating whether a murder was especially heinous, atrocious, or cruel, we apply the standard set out by the Alabama Supreme Court in Ex parte Kyzer, 399 So.2d 330 (Ala.1981)  was the murder unnecessarily torturous to the victim. 399 So.2d at 334.
In Norris v. State, 793 So.2d 847 (Ala. Crim.App.1999), we set out three factors that are relevant when determining whether a murder is especially heinous, atrocious, or cruel as compared to other capital murders: (1) Was the physical violence beyond that necessarily or sufficient to cause death? (2) Did the victim experience appreciable suffering after a swift assault that ultimately resulted in death? and (3) Was there any psychological torture?
Alabama appellate courts have repeatedly held that severe beatings that result in death are beyond the violence necessary to inflict death; therefore; that manner of homicide is especially heinous, atrocious, or cruel as compared to other capital murders. See Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005); Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (Ala.1997); Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004); Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000); Ex parte Hutcherson, 727 So.2d 861 (Ala. 1998); Ashley v. State, 651 So.2d 1096 (Ala.Crim.App.1994); McGahee v. State, 632 So.2d 976 (Ala.Crim.App.), aff'd, 632 So.2d 981 (Ala.1993).
Here, there was evidence indicating that Mrs. Johnson had a clear view of her husband's attack and that she was getting off the bed when she was struck by a hammer and fell backward onto the bed. The coroner, Dr. James C.U. Downs, testified that both victims died of multiple injuries to the head and skull fractures that were consistent with injuries caused by a hammer. Downs testified that Hiram Johnson suffered 15 lacerations to his head and that Mamie Johnson suffered 11 lacerations to her head. There was also blood-splatter evidence that was consistent with *1005 Hiram Johnson's kneeling during a part of his brutal attack. The Johnsons were viciously bludgeoned to death with a hammer. Seventy-nine-year-old Mamie Johnson watched as her 82-year-old husband was repeatedly beaten about the head with a hammer. Certainly, Mrs. Johnson knew that the same fate awaited her. As we stated in Norris v. State: "Alabama courts have recognized that the psychological torture inflicted by a victim's witnessing the death of a family member can be a factor making his subsequent death especially heinous, atrocious, or cruel." 793 So.2d at 860.
By any definition, the murders in this case were especially heinous, atrocious, or cruel as compared to other capital murders.
We further remanded this case for the circuit court to set but its reasons for not following the jury's recommendation and for that court to consider the jury's recommendation as a mitigating circumstance. The circuit court explained its decision:
"The Court finds that the aggravating circumstance, `The capital murder was committed while the defendant was engaged or was an accomplice in the commission of, ... robbery' adduced pursuant to § 13A-5-49(4), Code of Alabama 1975, is entitled to great weight.
"The Court finds that the aggravating circumstances, `The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses,' adduced pursuant to § 13A-5-49(8), Code of Alabama 1975, is entitled to great weight.
"The Court finds that the mitigating circumstances adduced pursuant to § 13A-5-51(1), Code of Alabama 1975, `The defendant has no significant history of prior criminal activity' is entitled to little weight.
"The Court finds that the mitigating circumstances adduced pursuant to § 13A-5-52 Code of Alabama 1975, substantially consisting of evidence regarding the Defendant's character, childhood, psychological history and condition, his educational history and condition, and his record of work and family achievement, and the jury's recommendation of a sentence of life imprisonment without parole by a vote of seven for life without parole and five for death, is entitled to moderate weight.
"The Court finds that the mitigating circumstances adduced pursuant to § 13A-5-52, Code of Alabama 1975, substantially consisting of evidence regarding the Defendant's character, childhood, psychological history and condition, his educational history and condition, and his record of work and family achievement, is entitled to moderate weight.
"The Court has carefully and soberly weighed the aggravating circumstances against the mitigating circumstances and it is the decision of this Court that the aggravating circumstances substantially outweigh the mitigating circumstances in this case. The advisory verdict of the jury was considered as a mitigating factor. There was no evidence that the jury acted in a capricious or arbitrary fashion; however, this Court did have an independent duty to weigh the evidence of aggravating circumstances and mitigating circumstances and simply found that the weight to be given to the aggravating circumstances and the weight to be given to the mitigating circumstances was different than that which must have been given by seven members of the jury. This court has considered that five of the jurors did find that the aggravating *1006 factors outweighed the mitigating factors. This court has no way of knowing what mitigating factors were found to exist by the jury, nor which aggravating circumstances were found to exist by the jury, nor what weight was given by each individual juror to those aggravating or mitigating circumstances when that juror decided how his or her vote would be reported in the advisory verdict."
The Alabama Supreme Court in Ex parte Taylor, 808 So.2d 1215 (Ala.2001), held that when a circuit court declines to follow a jury's recommendation of life imprisonment without parole, the circuit court must set out specific findings as to why it overrode the jury's recommendation and sentenced a convicted capital murderer to death. The next year in Ex parte Carroll, 852 So.2d 833 (Ala.2002), the Supreme Court held that the circuit court must consider a jury's recommendation of life imprisonment without parole as a mitigating circumstance. The Supreme Court in Ex parte Carroll stated:
"We take this opportunity to further explain the effect of a jury's recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the `triggerman' or a recommendation of leniency by the victim's family; the jury's recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance."
852 So.2d at 836 (footnote omitted).
Here, the circuit court treated the jury's recommendation as a mitigating circumstance, and it gave it moderate weight. The circuit court also noted that 5 of the 12 jurors recommended that McGowan be sentenced to death. Here, there was no conflicting evidence about who committed the murders, nor did the victims' family ask that McGowan be sentenced to life imprisonment without parole. The circuit court's findings as set out above are sufficient to comply with the dictates of Taylor and Carroll. See Hodges v. State, 856 So.2d 875 (Ala.Crim.App.2001).

II.
As required by § 13A-5-53, Ala.Code 1975, we address the propriety of McGowan's conviction and sentence to death. The record reflects that McGowan's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1), Ala. Code 1975.
McGowan was indicted for, and convicted of, killing two or more people pursuant to one act or course of conduct and for killing Hiram Johnson during the course of a robbery, violations of §§ 13A-5-40(a)(10) and 13A-5-40(a)(2), Ala.Code 1975. McGowan's capital-murder conviction is punishable by death.
The circuit court's sentencing order reflects that that court correctly weighed the aggravating circumstances and the mitigating circumstances and found that death was the appropriate sentence for McGowan's conduct. The circuit court found as aggravating circumstances that the murders occurred during the course of a robbery and that the murders were especially heinous, atrocious, or cruel as compared to other capital murders. As we stated in *1007 Part I of this opinion, the circuit court correctly found that the murders were especially heinous, atrocious, or cruel, see § 13A-5-49(8), Ala.Code 1975, and the jury determined beyond a reasonable doubt that the murders occurred during the course of a robbery.
The circuit court found as statutory mitigating circumstances that McGowan had no significant history of prior criminal activity and that the murders were committed while McGowan was under the influence of extreme mental or emotional disturbance because McGowan had voluntarily ingested cocaine shortly before he murdered the Johnsons. The circuit court also found the following nonstatutory mitigating evidence:
"The Court has considered, pursuant to § 13A-5-52, Code of Alabama 1975, the evidence adduced by the Defendant during the penalty phase of the trial regarding his character and record, particularly his history, his family life, psychological condition, intelligence, and the emotional and physical abuse suffered by the Defendant during his early childhood. The Court has considered the love of his family for him.
"The Court has considered those matters presented during the sentencing hearing held on this date, the arguments of counsel, and has considered the presentence report filed by the probation officer and admitted into evidence during the sentencing hearing on this date, and the response of the Defendant to the court's allocution."
The circuit court carefully weighed the aggravating and the mitigating circumstances, considered the jury's recommendation as a mitigating circumstance, and sentenced McGowan to death.
According to § 13A-5-53(b)(2), Ala.Code 1975, we have independently weighed the aggravating circumstances and the mitigating circumstances to determine the propriety of McGowan's sentence to death. In a calculated and premeditated manner McGowan brutally bludgeoned to death an elderly couple in their home. After completing the weighing process this Court concurs in the findings of the circuit court that the aggravating circumstances substantially outweigh the mitigating circumstances and is convinced that death is the appropriate sentence in this case.
Neither is McGowan's death sentence disproportionate to the sentences imposed in similar cases. See Daniels v. State, 534 So.2d 628 (Ala.Crim.App.1985), aff'd, 534 So.2d 656 (Ala.1986). "`In fact, two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder.'" Smith v. State, 795 So.2d 788, 842 (Ala.Crim.App. 2000), quoting McWhorter v. State, 781 So.2d 257, 330 (Ala.Crim.App.1999).[3]
Last, we have searched the record for any error that may have adversely affected McGowan's substantial rights and have found none. See Rule 45A, Ala.R.App.P.
McGowan's conviction and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur; COBB, J., recuses herself.
NOTES
[1] By order dated October 15, 2003, the Court of Criminal Appeals appointed Judge Patterson to sit specially on this case pursuant to §§ 12-18-7(b) and 12-18-10(e), Ala.Code 1975.
[2] McGowan was charged with capital murder for the death of Harper. He was tried separately for that offense.
[3] The murder occurred on August 18, 1993.
[4] We do not agree that the evidence showed that McGowan kidnapped Crane after the murders. Crane testified that McGowan had not done anything to her and that they did not have an argument; that she had the desk clerk at the motel telephone emergency 911 simply because she wanted to go home; and that she was scared because she had had time to think about what she and McGowan had done.
[5] Rule 19.3(a)(1) was amended effective December 1, 1997, to provide: "In the prosecution of any felony case, the trial court, in its discretion, may permit the jury hearing the case to separate during the pendency of the trial."
[6] The defendant had entered pleas of not guilty and not guilty by reason of insanity.
[7] Rule 3.112(d), Fla.R.Crim.P., provides that cocounsel be appointed upon written application and a showing of need by lead counsel.
[8] McGowan cited the following pages in support of this assertion: R. 22, 797, 1191, and 1247.

On R. 22, during a pretrial hearing on McGowan's motion for a change of venue, an "off-the-record discussion" was at the explicit request of defense counsel.
On R. 797, there is no indication or notation of a bench conference.
The bench conference noted on R. 1191 was clearly for defense counsel to review numerical information to determine whether they were going to assert a Batson motion. It is apparent that no discussion or argument was had during the bench conference. The record shows that, after the jury was selected, the trial court asked, out of the jury's hearing, whether defense counsel was going to make a Batson motion. When counsel stated that they did not have the percentages, the trial court gave them its notation of the pertinent numerical information and told them to "[l]ook down every possible category." Thereafter, notes the record, "an off-the-record discussion was had and done in the jury's presence but out of its hearing." Then, the trial court stated, "I tell you what, let's just be fair. Let's take a five minute recess, y'all go back in the back room ... and make a decision, okay?" After a brief recess, defense counsel announced that, after "look[ing] over the situation," they were not going to make a Batson motion.
Finally, in regard to the bench conference noted on R. 1247, nothing of any significant occurred because it was clear that, during that time, the trial court was reviewing law for a possible impeachment situation that never arose in the trial. During the parties' discussion about the admissibility of McGowan's pre-crime statements, defense counsel stated that they would move for a mistrial if the State's witnesses, who were to testify about McGowan's pre-crime statements, testified contrary to their pretrial statements. Then, the prosecutor stated that, if the witnesses so testified, he would offer their statements for impeachment. Then, the trial court stated, "I'd like to review that, let's go off the record."
[9] Although McGowan was sentenced before the Supreme Court announced its decision in Ring, because his case was pending on appeal when Ring was decided, the rule announced in Ring is applicable in this case. See Ex parte Waldrop.
[10] The Supreme Court noted that at the time that the United States Supreme Court released its opinion in Atkins, 18 of the 50 states had legislation that prohibited the execution of the mentally retarded.
[11] Since McGowan's prosecution, § 15-12-21(d) has been amended, effective June 10, 1999, to provide, in pertinent part, that the rate of compensation for attorneys representing indigent defendants shall be $30 per hour for out-of-court time, with no limit on compensation for an attorney in a case involving a capital offense, and that, effective October 1, 2000, the rate shall be $40 per hour.
[1] By order dated October 15, 2003, the Court of Criminal Appeals appointed Judge Patterson to sit specially on this case pursuant to § 12-18-7(b), Ala.Code 1975.
[2] In our original opinion we upheld the circuit court's admission of evidence of McGowan's involvement in an unrelated capital-murder case in Escambia County. Circuit court records show that in December 1996 McGowan pleaded guilty to the lesser-included offense of murder in exchange for a sentence of life in the penitentiary for killing Barry Harper.
[3] At the time of the murders, killing two or more people during one course of conduct was not an aggravating circumstance. Section 13A-5-49(9), Ala.Code 1975, was added effective September 1, 1999, to make killing two or more people during one course of conduct an aggravating circumstance that would support a sentence of death.